Robert Gladstone **BELL**, Plaintiff,

v.

**HOME LIFE INSURANCE COMPANY**, Defendant.

No. C–82–1003–G.

United States District Court, M.D. North Carolina, Greensboro Division.

Nov. 15, 1984.

G.S. Crihfield, Greensboro, N.C., for plaintiff.

Guy F. Driver, Jr. and Keith A. Clinard, of Winston-Salem, N.C., for defendant.

## MEMORANDUM OPINION

GORDON, Senior District Judge.

### I. INTRODUCTION

This cause was commenced on October 5, 1982, by plaintiff Robert Bell pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Title VII). Plaintiff, originally from New Zealand, alleges that defendant Home Life Insurance Company (Home Life), through its agent, Mr. Peter Schick, violated Title VII by discriminating against plaintiff because of his national origin. The alleged discriminatory conduct took the form of failure to provide adequate training and support services, remarks about plaintiff's accent and manner, and finally his termination as a salesman for Home Life.

A trial upon these claims was held on October 15 and 16, 1984, the Court having jurisdiction pursuant to 28 U.S.C. § 1343. Having fully considered the evidence presented at trial, arguments of counsel, trial briefs, and other matters of record, the Court concludes that plaintiff has failed to show illegal discrimination that would entitle him to recover from defendant.

### II. FACTS

Plaintiff was an extremely successful insurance salesman in his native New Zealand. His success earned him membership

in the Million Dollar Round Table, an international organization honoring the top 2½ per cent of life insurance salesmen. The plaintiff attended several insurance seminars in the United States. At those seminars he became acquainted with Mr. Thomas Sullivan of Greensboro, North Carolina, who convinced plaintiff to immigrate to America. Sullivan began assisting in plaintiff's immigration, but during the initial steps of the process Sullivan met his untimely death.

Through Sullivan's widow, Mr. Robert Pope learned of plaintiff's situation. Pope, then manager of Home Life's Greensboro office, decided to help Bell fulfill his plans to come to America. Pope corresponded with plaintiff at length and complied with federal regulations so that plaintiff could come to Greensboro to work for Home Life. On November 4, 1980, amid much hoopla,[1] plaintiff stepped off the plane in Greensboro, a Home Life agent.

Although Bell was an experienced and talented salesman, it was obvious that he would face a major problem: he knew only two people in the United States and thus was lacking a "natural market." [2] Because he had no "natural market," Pope and he had agreed that the best way to orient him with Home Life would be for Pope to work closely with him, going on joint calls to prospective clients and providing him with orphan policies.[3] As with many of the best laid schemes, however, this plan soon went astray: shortly after Pope began training plaintiff, Pope was notified by Home Life that he was being replaced as manager of the Greensboro agency.

On January 25, 1981, Mr. Peter Schick took over in Pope's place. Schick had met with great success at Home Life's St. Louis office,[4] and was an expert in training agents and improving productivity. His style was aggressive and by-the-book, and the book was the *Multi Million Dollar Method* (MMDM). The *MMDM* is a detailed methodology, co-authored by Schick, for organizing and developing a career in life insurance sales. It involves memorizing complex sales presentations, making a certain number of calls per week to prospective clients, and keeping detailed records of daily activity.[5] For Schick and others it had proven a "pathway to success"; for Bell it would prove a long and frustrating road.

Bell was upset by the change in management. Not only did he feel cast adrift by the loss of Pope, but Schick's management style did not suit him. Bell felt that Home Life was not living up to its bargain with him, and his dissatisfaction was aggravated by his feeling that Pope had been treated unfairly. Although he had access to the same support and training materials as the other agents, the special attention he had so fleetingly enjoyed was no longer forthcoming. Bell did not follow the procedures set out in the *MMDM*, trying instead to do things his own way. Bell's attitude grew worse. When admonished to follow the

1. Bell was met at the airport by representatives of Home Life and driven to the festooned office for a celebration of his arrival.

2. Bell's problem of no natural market was emphasized in the results of the Merritt Personnafax Report. This aptitude test was taken by Bell before he came to the United States as a condition of his job with Home Life. Bell scored well in all categories except natural market, which was noted as a "Big Problem."

3. An orphan policy is a policy whose writing-agent has since left the company. These are generally reassigned to a current agent. Pope planned to take orphan policies away from agents who had not actively pursued them and give them to Bell. Although Pope said this was

the prerogative of the manager, Schick stated that once a policy had been assigned he would never take it from the agent.

4. The St. Louis agency was the leading sales office in the country. During his tenure in Greensboro, the local agency rose from 33rd to 10th in the company. Schick has trained over 100 agents using his methods.

5. Although Pope had actually given Bell a copy of the *MMDM* in November 1980, Pope had not stressed its use. He felt it was designed to teach a person new to insurance sales but with a natural market; Bell, he felt, knew sales but lacked the market, and so the *MMDM* was inappropriate. Schick noted that some 60 pages in the book are devoted to developing a market.

*MMDM,* he criticized it as inappropriate for him.[6] He became increasingly frustrated and remained unproductive.

Part of his problem, he claims, was attributable to cultural differences. He contends that he lacked familiarity with certain technical terms and American usages. In retrospect, he agrees that his dress and grooming were somewhat inappropriate to the American sales climate, and his sales technique too aggressive.

At the same time Bell enjoyed certain advantages over the other agents. Pope had provided him with a private office upon arrival, while all the other agents shared office space. Bell was also the only agent who was given a monthly draw against salary and whose moving expenses were compensated by Home Life.[7] In addition, there is evidence that Schick arranged for Pope, after his termination, to continue to work with Bell and receive overrides on Bell's sales.[8] Although this scheme might have proven mutually beneficial, Bell and Pope never proceeded with it.

In addition, Bell enjoyed a lower sales quota than the other agents. Under the *MMDM,* specific sales goals are set, and new salespeople are generally expected to sell one million dollars of insurance in their first year, or $83,000.00 per month. Because of Bell's unusual circumstances, in February 1981 Schick agreed to establish a somewhat lower goal of $50,000.00 per month for his first eight months with Home Life retroactive to his November arrival. Although Bell went on a number of joint sales calls with other, more experienced agents, at the end of those eight months he had generated only $55,000.00 total sales. He was notified by Schick in a letter dated July 15, 1981, that he was being terminated for lack of production.

In September of 1981 Bell was introduced to Mr. Ronald E. Austin by Pope. Austin, who had formerly been with Home Life, was then head of an agency selling Integon insurance. Austin offered Bell a position, but Bell initially refused because of his experience at Home Life. A month later Bell accepted, and Austin began to train him in much the same manner Pope had suggested: Austin went on joint calls with Bell and provided him with orphan policies as leads. Austin also proceeded to "Americanize" Bell by recommending changes in his dress, grooming, and manner. Bell, it appears, was a willing and able pupil, for within a year he sold some 5 million dollars in face value of insurance and became one of only two people ever to qualify for the Million Dollar Round Table in two different countries. At the time of trial, Bell continues to pursue a happy and prosperous career with Integon.

## III. DISCUSSION

Title VII states:

It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin, or ... to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an

---

6. *See* note 5, *supra.*

7. To meet immigration requirements Pope had certified that Bell would receive $1,000.00 per month salary. When Bell arrived, however, he signed a contract providing strictly commission instead. In early February 1981 Bell went to Schick complaining of his financial straits: he had yet to be paid a cent and his savings were exhausted. Schick informed the New York Office of the situation and Home Life agreed to pay Bell $1,000.00 per month draw against commission retroactive to his arrival. Home Life also agreed to pay Bell approximately $5,000.00 of the over $11,000.00 moving expenses he had requested; although Home Life felt it had no legal obligation to do so, it expressed a sense of moral obligation. In a letter to Pope, however, Home Life expressed its view that Pope was responsible for the problem and would be held accountable for any loss by Home Life.

8. Overrides are the commission received by a salesman's supervisor.

employee, because of such individual's ... national origin.

42 U.S.C.A. § 2000e–2 (1981). The statute fails further to define national origin, but the Supreme Court has stated that "[t]he term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973). The E.E.O.C. guidelines define national origin discrimination as

> including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group.

29 C.F.R. § 1606.1 (1984).

█ In a case claiming disparate treatment under Title VII, plaintiff has the initial burden of establishing by a preponderance of the evidence a *prima facie* case of discrimination. In this context, a *prima facie* case is "not the equivalent of a factual finding of discrimination ... [r]ather, it is simply proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Construction Corporation v. Waters,* 438 U.S. 567, 579–80, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978). The burden then shifts to defendant to articulate a legitimate nondiscriminatory reason for the alleged discriminatory treatment. If the defendant carries this burden, the plaintiff may then prove that the reasons offered by defendant were a pretext for its discriminatory conduct. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Of course, the plaintiff bears the

ultimate burden of proving discriminatory treatment. 450 U.S. at 253, 101 S.Ct. at 1093. Proof of discriminatory animus is critical, although it can be inferred from the mere fact of differences in treatment. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

█ To prove his case Bell contends that, because he is from New Zealand, he was not provided with the individualized training he was promised, he was not given access to certain training and support materials, he was ridiculed because of his accent, and he was finally discharged. After plaintiff had presented his case, it was concluded that he had met his initial burden of proving a *prima facie* case, because in the absence of any other explanation it was more likely than not that defendant's actions were bottomed on impermissible considerations. *Furnco,* 438 U.S. at 579–80, 98 S.Ct. at 2950–51.

Home Life, in presenting its case, argued that Bell was given training and support equal to or greater than the other agents, that he was an unproductive salesman with a negative and disruptive attitude, that he consistently failed to follow the prescribed procedures, and that his firing was a purely business decision. After the defense had been presented, it became clear that much of the factual basis of plaintiff's *prima facie* case had been refuted, and any remaining inference of discrimination was rebutted by proof that Home Life's actions were legitimate, nondiscriminatory, and not pretextual.

█ Plaintiff emphasizes the training he was promised by Pope and the supposedly lesser training actually provided by Home Life. Any disparity, however, if there were one, would not be the type of wrong that Title VII was intended to remedy. Rather, any claim would be in the nature of a breach of contract, which has already been asserted by plaintiff and disposed of

in a previous lawsuit.[9] Instead, Title VII addresses any disparity between the treatment received by Bell and that given the other agents, and it is upon this that the Court must focus. *See Wright v. National Archives and Records Service,* 609 F.2d 702 (4th Cir.1979).

■ Plaintiff claims that he was prevented from attending certain meetings that the other agents were allowed to attend, particularly those involving Physicians' Planning Service. There is unrefuted evidence, however, that this service was available only to dues paying members, that Bell never paid dues, and that in fact he was given a certain limited access to that service regardless. In addition, plaintiff was given certain other advantages over the other agents: a private office, lower sales quota, payment of moving expenses, and draw against commission. These were all intended to assist plaintiff during his training period.

It also appears that every agent, including Bell, had equal access to training materials and support. It is true that Schick went on joint calls with other agents and none with Bell, but this is because Bell signed up with Schick for only three such calls; when they were cancelled for various reasons, Bell stopped signing up out of "frustration." The reasons for the cancellations were legitimate, however, so the Court cannot attribute any discriminatory animus to them or, by implication, to the creation of Bell's frustration.

It is also true that Bell lacked a natural market in Greensboro. He claims that if Schick had reassigned orphan policies to him, he could have succeeded in developing a market; this he substantiates with his success at Integon using orphan policies as a market base. Plaintiff has failed, however, to show any discrimination in this regard. He claims that Schick could have taken the policies away from other agents who were not actively pursuing them. Schick stated, however, that as a policy he would not reassign clients once appointed, and plaintiff did not prove that Schick had ever done so. Thus, it is concluded that plaintiff received training and support equal to the other agents, and was not discriminated against in that regard.

Plaintiff also charges that Schick made disparaging remarks about his accent, leading to a general sense of frustration and inadequacy on Bell's part. This, he claims, establishes a case of national origin discrimination. This area of the law is extremely uncertain. In *Garcia v. Gloor,* 618 F.2d 264 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981), the court stated that save for religion, Title VII "focuses its laser of prohibition" on those characteristics that are beyond the victim's power to alter. 618 F.2d at 269. This rationale, which distinguishes and analyzes in terms of mutable and immutable characteristics, had been applied in sex discrimination cases, *Willingham v. Macon Telegraph Publishing Co.,* 507 F.2d 1084 (5th Cir.1975); *Baker v. California Land Title Co.,* 507 F.2d 895 (9th Cir.1974), *cert. denied* 422 U.S. 1046, 95 S.Ct. 2664, 45 L.Ed.2d 699 (1975), *see Earwood v. Continental Southeastern Lines, Inc.,* 539 F.2d 1349 (4th Cir.1976), but in *Garcia* it was applied in the context of national origin discrimination, specifically the speaking of native language on the job. 618 F.2d at 269. *See Garcia v. Gloor: Mutable Characteristics Rationale Extended to National Origin Discrimination,* 32 Mercer L.Rev. 1275 (1981).

■ At least one court has applied this rationale to foreign accent, stating that "[t]his Court cannot give legal cognizance to adverse employment decisions made simply because a person speaks with a foreign accent." *Carino v. University of Okla-*

9. *Bell v. Home Life Insurance Co.,* C–81–669–G (M.D.N.C. July 29, 1982) (no breach of employment contract since plaintiff failed to prove definite period of employment). It is arguable that if these initial promises were made with the intent to draw plaintiff, because he is from New Zealand, into a situation where he could be discriminated against, that would be actionable under Title VII. No such allegations were made, however, nor proof presented thereof; in fact, that scenario seems rather absurd.

*homa*, 25 F.E.P. Cases 1332, 1337 (W.D. Ok.1981). In addition, in *Berke v. Ohio Department of Public Welfare*, 628 F.2d 980 (6th Cir.1980) (per curiam), the court upheld a district court determination that discrimination on the basis of a foreign accent was a sufficient basis for finding national origin discrimination. Foreign accent is also a "linguistic character of a national origin group." 29 C.F.R. § 1606.1 (1984). Although this issue has never arisen in this Circuit, this Court concludes that if plaintiff could prove that he had been discriminated against because of his accent, he would establish a *prima facie* case of national origin discrimination. Plaintiff has failed to convince the Court, however, that any such discrimination took place.

Plaintiff claims that Schick ridiculed his accent; Schick denies this. It is concluded that if such remarks were made, they were not made with the frequency or severity alleged, and certainly did not arise to any discriminatory harrassment. *See Cariddi v. Kansas City Chief Football Club*, 568 F.2d 87 (8th Cir.1977). Nor has plaintiff proven that there was any specific discriminatory conduct attached to the remarks. At most they create an inference that there was some animus on Schick's part.

Plaintiff relies on this implication of animus as proof that he was fired because he was from New Zealand. Assuming *arguendo* that such an animus existed, defendant Home Life has sufficiently proven that the decision to terminate Bell was motivated by business reasons, thus rebutting any *prima facie* case.

The evidence shows that Bell failed to comply with his training requirements. For instance, he filed only four weekly reports during his seven month tenure. Although he claims his unfamiliarity with American terminology was the cause, this is refuted by his command of the language and his success on the licensing exam. Bell admits that his attitude became very negative after Pope was fired, and there is evidence that his attitude carried over into his office demeanor. He violated Home Life policy by airing his grievances in the work environment. But the bottom line was the bottom line: Bell did not sell enough insurance. His quota was $50,-000.00 per month; in seven months he sold only $55,000.00. This, it is concluded, is the reason that Bell was terminated, and it is a valid business reason and not a pretext for any discriminatory motive.

The Court is not unsympathetic to Bell's plight. He is a congenial and talented individual. He was successful in New Zealand and had every reason to expect success with Home Life. His coming to America was a bold move, and he made that move relying on assurances by Pope, who was soon fired by Home Life. Pope's replacement, Peter Schick, was a young, aggressive, no-nonsense manager who did things his own way. His style did not mesh with Bell's, and there was a clash of two strong personalities. Bell resisted, failed to produce, was fired, and then was left to his own devices in an unfamiliar country and with a family to support.

The Court sympathizes with Bell. He has failed, however, to prove that Home Life discriminated against him because he is from New Zealand; the scenario would have been the same if plaintiff were from New Jersey. Therefore, it is concluded that plaintiff, Robert Bell, is not entitled to relief from defendant under Title VII, and that his case must be dismissed.

■ Defendants have requested that the Court award attorney's fees pursuant to 42 U.S.C.A. § 2000e–5(k) (1981). Plaintiff's case was in no manner frivolous, unreasonable, nor brought in bad faith, and so defendant's request is denied. *Crawford v. Western Electric Co.*, 614 F.2d 1300, *reh'g denied* 620 F.2d 300 (5th Cir.1980).

The Court will enter an Order simultaneously herewith disposing of this action in accordance with this Memorandum Opinion.