**Alva GUTIERREZ, Plaintiff–Appellee,**

v.

**MUNICIPAL COURT OF the SOUTHEAST JUDICIAL DISTRICT, COUNTY OF LOS ANGELES, incorrectly sued as "County of Los Angeles, a public entity; Porter De Debovay; John W. Bunnett; and Russell F. Schooling, in their capacity as officials having authority to issue personnel rules for employees of the County of Los Angeles at the Municipal Court of the Southeast Judicial District," Defendants–Appellants.**

**Alva GUTIERREZ, Plaintiff–Appellee,**

v.

**Porter DE DEBOVAY; John W. Bunnett; and Russell F. Schooling, Defendants–Appellants.**

Nos. 85–5931, 85–6532 and 86–5888.

United States Court of Appeals, Ninth Circuit.

Nov. 23, 1988.

Before BROWNING, TANG and REINHARDT, Circuit Judges.

The panel has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. The full court was

---

advised of the suggestion for an en banc hearing, and a vote was taken. A majority of the active judges failed to vote for the suggestion. The petition for rehearing is denied and the suggestion for a rehearing en banc is rejected.

KOZINSKI, Circuit Judge, with whom Circuit Judges DAVID R. THOMPSON and O'SCANNLAIN join, dissenting from the order rejecting the suggestion for rehearing en banc.

By any rational standard, this case cries out for en banc consideration. The panel's opinion creates a square conflict with the Fifth Circuit's opinion in *Garcia v. Gloor*, 618 F.2d 264 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). The panel also buries a prior opinion of this circuit whose holding is directly contrary. *Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406 (9th Cir.1987). Perhaps most disturbing, the panel reaches a result that severely undermines the principal goal of the Civil Rights Act of 1964, equal opportunity in the workplace. By giving employees the nearly absolute right to speak a language other than English, the panel's opinion will exacerbate ethnic tensions and force employers to establish separate supervisorial tracks for employees who choose to speak another language during working hours. This is not what the Civil Rights Act was meant to accomplish; we do a serious disservice to the worthy goals of that legislation by allowing the panel's opinion to stand as the law of this circuit.

## I. Background

This case involves a Title VII disparate impact challenge to a limited English-only rule adopted by the Municipal Court of the Southeast Judicial District, County of Los Angeles. The Municipal Court employs a number of bilingual deputy clerks whose duties include dealing with members of the public who speak only Spanish. In 1984, after a complaint from a black employee, the Municipal Court adopted a rule requiring all employees to speak English while working, except when translating for the public. The rule did not apply during lunch hours or breaks.

Plaintiff Alva Gutierrez filed suit in federal district court, contending that the English-only rule constitutes racial and national origin discrimination in violation of Title VII. The district court granted Gutierrez's request for a preliminary injunction against enforcement of the rule. On appeal, a panel of this court affirmed. *Gutierrez v. Municipal Court*, 838 F.2d 1031 (9th Cir. 1988).

## II. Inter–Circuit Conflict

In any lawsuit involving a disparate impact claim under Title VII, the plaintiff bears the initial burden of establishing a prima facie case. This "consists of a showing of significant disparate impact on a protected class, caused by specific, identified, employment practices or selection criteria." *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1485 (9th Cir.1987) (en banc), *cert. granted in part*, —— U.S. ——, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988). The panel here holds that the English-only rule constitutes that type of discriminatory employment practice. *See Gutierrez*, 838 F.2d at 1040–41.

This holding is in direct conflict with that of the Fifth Circuit in *Garcia v. Gloor*, 618 F.2d 264 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). *Garcia* considered an identical fact situation: The employer prohibited its bilingual sales employees from speaking Spanish while working, except when addressing customers who spoke Spanish. Garcia, who was bilingual but whose primary language was Spanish, challenged the rule as a discriminatory condition of his employment.

In a carefully reasoned opinion, Judge Rubin rejected Garcia's claim. He noted that the Civil Rights Act "forbids discrimination in employment on the basis of national origin. Neither the statute nor common understanding equates national origin with the language that one chooses to speak." 618 F.2d at 268 (footnote omitted). Judge Rubin noted that the discretionary use of a second language is not an immutable characteristic like national origin, race

or gender. *Id.* at 269. He distinguished the situation where "a person ... speaks only one tongue or ... has difficulty using another language than the one spoken in his home"; in that situation "language might well be an immutable characteristic like skin color, sex or place of birth." *Id.* at 270. "However," the Fifth Circuit held, "the language a person who is multi-lingual elects to speak at a particular time is by definition a matter of choice." *Id.* More generally, the *Garcia* court concluded that "there is no disparate impact if the rule is one that the affected employee can readily observe and nonobservance is a matter of individual preference. Mr. Garcia could readily comply with the speak-English-only rule; as to him nonobservance was a matter of choice." *Id.*[1]

The Fifth Circuit acknowledged "the importance of a person's language of preference [as an] aspect[·] of his national, ethnic or racial self-identification." *Id.* It addressed Garcia's argument that " 'others like to speak English on the job and do so without penalty. Speaking Spanish is very important to me and is inherent in my ancestral national origin. Therefore, I should be permitted to speak it and the denial to me of that preference so important to my self-identity is statutorily forbidden.' " *Id.* at 271. The Fifth Circuit rejected this argument: "The argument ... reduces itself to a contention that the statute commands employers to permit employees to speak the tongue they prefer. We do not think the statute permits that interpretation, whether the preference be slight or strong or even one closely related to self-identity." *Id.*

*Garcia* specifically rejected the EEOC's argument (accepted by our panel) that the English-only rule had to be supported by business necessity. It therefore refused to adopt the rule (adopted by our panel) that the employer must use the least restrictive means of accomplishing his objective: "The statute does not give the judiciary such latitude in the absence of discrimination. Judges, who have neither business experience nor the problem of meeting the employees' payroll, do not have the power to preempt an employer's business judgment by imposing a solution that appears less restrictive." *Id.*[2]

Our panel does not attempt to distinguish *Garcia*, nor could it. Its opinion does not even bother to address the reasoning adopted by our sister circuit. It thereby creates a sharp and irreconcilable conflict between the two circuits that probably have the largest bilingual populations in the country. Yet this is precisely the type of rule that demands national uniformity, and therefore the type of case where en banc consideration is called for under our rules. Ninth Cir.R. 35–1 (en banc appropriate "[w]hen the opinion of a panel directly conflicts with an existing opinion by another court of appeals and substantially affects a rule of national application in which there is an overriding need for national uniformity").

### III.   Intra–Circuit Conflict

While the panel does not distinguish *Garcia v. Gloor*, it goes to unusual lengths to dispose of *Jurado v. Eleven–Fifty Corp.*, 813 F.2d 1406 (9th Cir.1987), which followed *Garcia*. *Jurado* involved a discrimination claim by a bilingual disc jockey who was fired for disobeying a rule forbidding him to use occasional Spanish words and phrases on the air. Jurado sued under Title VII, bringing, inter alia, a disparate

---

1.   The Fifth Circuit drew an instructive analogy to a rule forbidding smoking on the job. "The Act would not condemn that rule merely because it is shown that most of the employees of one race smoke, most of the employees of another do not and it is more likely that a member of the race more addicted to tobacco would be disciplined." *Id.* at 270.

2.   After *Garcia* was decided, the EEOC embodied its position in a guideline. *See* 29 C.F.R. § 1606.7(b) (1987). The EEOC's adoption of this guideline does not diminish the circuit conflict because *Garcia* expressly disapproves the EEOC's interpretation of the statute. *See* 618 F.2d at 270–71. EEOC guidelines, of course, are not binding on the courts and are not even persuasive to the extent they are inconsistent with the underlying statute and congressional intent. *See General Elec. Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–40, 38 L.Ed.2d 287 (1973).

impact claim. Our panel resolved the matter by adopting the rationale of *Garcia;* there was no discrimination because the employee could easily comply with the employer's English-only rule. *Jurado*'s disparate impact analysis is brief and bears quoting in full:

> A disparate impact case involves a facially neutral employment practice that disproportionately disadvantages one group as against another. *Palmer [v. U.S.],* 794 F.2d [534] at 538 [ (9th Cir. 1986) ]. To establish a prima facie case, the employee must identify an employment practice which has a significant adverse impact on the protected group, *id.,* but need not show the employer intended to discriminate, *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971).
>
> The district court found Jurado's only basis for a disparate impact claim was that the English-only order somehow disproportionately disadvantaged Hispanics. The court found this theory was without merit as applied to Jurado because *Jurado was fluently bilingual and could easily conform to the order. Jurado v. Eleven–Fifty Corp.,* 630 F.Supp. [569] at 580 [ (C.D.Cal.1985) ] (citing *Garcia v. Gloor,* 618 F.2d at 270). We agree.

813 F.2d at 1412 (emphasis added).

By any fair reading, *Jurado* disposes of the disparate impact claim presented in *Gutierrez.* As the first to address the issue in this circuit, the *Jurado* panel chose to follow the Fifth Circuit's analysis in *Garcia:* If the employee is able to speak English, imposition of an English-only rule does not have a discriminatory impact. *Jurado* does not discuss business necessity or least restrictive alternative.

Faced with the insuperable problem of *Jurado*, the *Gutierrez* panel deftly recharacterizes it as a case where the English-only rule "met *the business necessity test.*" 838 F.2d at 1041 (emphasis original). *Jurado*, of course, said no such thing. Close examination of the two short paragraphs quoted above reveals that the words "business necessity" did not find their way into *Jurado*'s discussion of the issue. To the contrary, *Jurado* relied exclusively on *Garcia v. Gloor,* which *rejected* the business necessity test. In hamhanded fashion, the *Gutierrez* panel throws *Jurado*'s rationale out the window and substitutes its own.[3]

In fact, *Jurado* could not have held for the employer on business necessity grounds. The reason is simple: *Jurado* was an appeal from a grant of summary judgment. I am aware of no case in this circuit, or anywhere else for that matter, affirming a grant of summary judgment in favor of an employer who relied on a business necessity defense.[4] *Jurado* is certainly a very bad candidate for the distinction of being the first such case. Jurado was a Latino disc jockey who broadcast in English. Occasionally, however, he would throw in "some 'street' Spanish words and phrases." 813 F.2d at 1408. A consultant advised the radio station that "the bilingual format hurt [the station's] programming, the rest of which was in English." *Id.* That's *all* the employer proved. The consultant did not say that the public could not understand Jurado, only that his sporadic use of Spanish expressions "confused" some listeners. *Id.* If, as the *Gutierrez*

---

**3.** The panel also observes, in a footnote, "[s]ignificantly, at the same place in *Jurado* that we cited *Garcia* we cited with approval the EEOC English-only guidelines, and specifically mentioned the business necessity requirement. 813 F.2d at 1411." 838 F.2d at 1041 n. 13. This observation is off the mark. While *Jurado* cited the EEOC's guideline for a different proposition, this occurred in the discussion of *Jurado*'s disparate *treatment* claim, not in the disparate *impact* section.

**4.** As the panel recognizes, establishing a business necessity defense is exceedingly difficult:

> In order to meet the business necessity exception the justification must be sufficiently compelling to override the discriminatory impact created by the challenged rule. In addition, the practice or rule must effectively carry out the business purpose it is alleged to serve, and there must be available no acceptable less discriminatory alternative which would accomplish the purpose as well.
>
> *Gutierrez,* 838 F.2d at 1041–42 (citations omitted).

panel holds, language is " 'an essential national origin characteristic,' " 838 F.2d at 1039, equivalent to skin color or gender, the station could no more have dismissed Jurado because his occasional use of Spanish expressions might "confuse" listeners than it could have fired a female sports announcer on the ground that listeners were "confused" about the station's commitment to its sports programming.[5]

The problem, of course, is that the *Gutierrez* panel is distorting, not reporting, *Jurado.* This type of creative revisionism of prior panel opinions cannot be suffered in any circuit, and particularly not in a circuit our size. We do an injustice to the parties before us, and the many others who follow, when we distinguish precedent on fanciful or insubstantial grounds. When a panel of this court affords the opinion of a prior panel the treatment *Gutierrez* affords *Jurado,* we have no reasonable choice but to take the case en banc. Our failure to do so only gives comfort to those who claim that the circuit is too large to adequately manage its own affairs.

## IV. Exceptional Importance

The panel's opinion also merits en banc reconsideration because it badly disserves the policies of the Civil Rights Act. By hamstringing employers who would assuage racial and ethnic tensions created by use of a second language in the workplace, the opinion will help bring about many of the conditions the Civil Rights Act was meant to eliminate.

We need not trot out a parade of horribles; this case illustrates the problem effectively enough. The case arises out of racial and ethnic tensions among the employees of the Southeast Los Angeles Municipal Court, largely between blacks and Latinos. The English-only rule was not adopted by the Municipal Court judges out of xenophobia, but in response to a "complaint from a black female employee concerning the use of the Spanish language between employees in order to conceal the substance of conversation during working hours on the work floor...." Declaration of Joseph Sharar, Chief Clerk and Court Administrator, Municipal Court of the Southeast Judicial District, Huntington Park, County of Los Angeles, State of California, at 2. The rule was also intended to assist "supervisors to understand the work conversations of their subordinates...." *Id.*

The rule was adopted because "several of the 27 full-time clerks, including Anglos, blacks and even some Latinos, complained that a handful of Latino clerks were increasingly using Spanish to cloak their conversations and occasionally made it clear that they were discussing co-workers." Stewart, *Huntington Park Judges 'Incredulous'; English–Only Rule Still Creating Uproar,* L.A. Times, Apr. 11, 1985, pt. 9, at 1, cols. 1–2 (Southeast ed.) [hereinafter Stewart]. One employee reported a particularly distressing incident:

> Suzanne Cook, a black employee who was among the first to complain about the use of Spanish ... recalled a day at work when she tripped or dropped something "and the banter in Spanish really got going, and it was obvious that they were laughing at me for doing something stupid."
>
> If she had understood their jokes, she said, "it wouldn't have been a real big thing, because I would have just shot a comment back. But instead I had to keep it inside, and that was incredibly frustrating. After months of that kind of tension, I was looking for a new job."

*Id.* at 8, col. 2.

The English-only rule had broad employee support. The record contains a letter, signed by eight employees who were concerned that the rule might be overturned:

---

5. Ironically, the panel's interpretation of *Jurado* may have the unwitting effect of encouraging the dismissal of Title VII disparate impact claims at summary judgment. Under *Gutierrez* 's interpretation of *Jurado,* the employer need only provide a self-serving affidavit to overcome the plaintiff's evidence of discriminatory impact. Subsequent courts might well rely on this interpretation of *Jurado* to hold that this amount of proof is sufficient, as a matter of law, to establish the defendant's affirmative defense at the summary judgment stage.

If the [Municipal Court] Judges ruling is overturned it will have an adverse effect. Spanish is not essential when relating to fellow employees, and in many cases is used to undermine supervision and to talk about fellow employees. Feelings are hurt and tension builds. This is when employee camaraderie and morale begin to deteriorate.

Potential employees must be able to speak and write the English language fluently. Examinations for potential employees are given in English, as are the oral interviews, and all promotional examinations. The English language is designated as language of the Court in the Civil Code of Procedure. In light of this, it would seem the Judges rule was fair and just.

The ruling was initially intended to create a more harmonious working atmosphere for all employees. It has now been turned into an issue of ethnic background and civil rights. In reality the *only* issue is common courtesy.

Letter from Marie Williams, et al., to Phil Giarrizzo, General Manager, Local 660, Service Employees International Union (February 19, 1985) (emphasis original). Support was not limited to non-Spanish-speaking employees; according to the *Los Angeles Times,*

> at least two of the courthouse's 10 full-time Latino clerks [support the rule].
>
> . . . .
>
> The clerks, including one Latino, said the judges and English-speaking clerks

have been unfairly portrayed as discriminating against Latinos.

. . . .

> One Latino clerk, who asked not to be named, said that when she heard about the English-only rule, "my interpretation of it was, 'Be more courteous. Do not abuse your Spanish-speaking or bilingual abilities.' I completely support the rule."
>
> She said that in the courthouse "I have never been discriminated against by the judges, the supervisors or by my co-workers, and neither has anyone else I've ever heard about."

Stewart at 8, cols. 1, 2–3.

The question of what authority an employer has to address language-related tensions in the workplace is one of exceptional importance. As sad experience elsewhere has shown, language can be a potent source of racial and ethnic discrimination, exacerbating geographic, cultural, religious, ethnic and class divisions. In Canada, for example, the bitter mutual resistance of French- and English-speaking citizens toward one another's language has taken on the characteristics of a racial confrontation. *See* Porter, *Ethnic Pluralism in Canadian Perspective,* in *Ethnicity: Theory and Experience* 268 (N. Glazer & D. Moynihan eds. 1975) [hereinafter *Ethnicity* ].[6] Other examples abound: The long-standing division between the French-speaking Walloons and the Flemish-speaking population of Belgium [7] and the "language demands" in various regions of India [8] reflect linguistic as well as class and ethnic divisions of the most invidious sort.[9] The separatist movements by the Corsicans

---

**6.** Several commentators note that language differences have become emblems of class as well as ethnic group membership; often the dispute over dialect or language choice disguises deeper racial or religious divisions. *See, e.g.,* P. van den Berghe, *The Ethnic Phenomenon* 211 (1987) [hereinafter van den Berghe] (arguing that the "real impetus to Quebecois nationalism ... has been a class conflict in linguistic disguise").

**7.** *See, e.g.,* van den Berghe, n. 6 *supra,* at 197–205 (language conflicts have been especially bitter in Belgium because they are heavily overlaid with class conflicts); Petersen, *Subnations of Western Europe,* in *Ethnicity,* p. 12 *supra,* at 198–208.

**8.** *See* Das Gupta, *Ethnicity, Language Demands, and National Development in India,* in *Ethnicity,* p. 12 *supra,* at 466–86.

**9.** According to Pierre van den Berghe, French-speaking Belgians often looked down on Flemish (or Dutch) "as an inferior, uncultured, though earthy and colorful peasant dialect." van den Berghe, n. 6 *supra,* at 203 n. *. Bigotry and class consciousness, manifestations of what he termed this invidious bilingualism, *id.,* bore great resemblance to attitudes reflected in the demeaning Jim Crow laws. French was seen by the Walloons as the language of communication with their class equals; they reserved Flemish for speaking with shopkeepers, tradesmen, maids and tenant farmers. This linguistic snobbery, recalls van den Berghe, was pervasive:

of France, the Basques of Spain, the Tamils of Sri Lanka, the Kurds of Turkey and Iraq, and the Sikhs of India have been reinforced and to some extent inspired by linguistic differences.[10]

Although the United States has become the home for people from all parts of the world, we have been spared much of the language-related agonies experienced elsewhere. A nation of immigrants, we have been willing to embrace English as our public language, preserving native tongues and dialects for private and family occasions. *See generally* Rodriguez, *Aria: Memoir of a Bilingual Childhood*, The American Scholar, Winter 1980–81, at 25.[11] When employees bring their private language into a public work-place, this creates a difficult and sensitive problem for those around them who do not speak the language. Of course, where employees are unable to speak English, or where they are denied a benefit because they are identified with a particular language or ethnic group, the Civil Rights Act protects them; language is, for them, an immutable characteristic. *See Garcia v. Gloor*, 618 F.2d at 270. But where employees are perfectly capable of speaking English,[12] it is a much closer question whether they should be entitled to converse in another language during working hours while performing work functions. The right answer will vary with the particular fact situation and ought not be set in concrete for all employers and all employees.

As this case illustrates, having employees use a language other than English can seriously undermine workplace morale. Here, the Municipal Court judges acted in response to a legitimate complaint by a black employee about what she believed were insulting comments made in a language she could not understand.[13] An English-only rule may not make sense in all situations; sometimes it may be counterproductive, causing more hurt feelings than it saves. But it is highly unwise to prohibit all employers everywhere from adopting such a rule, even when they have reason to believe that language is being used to exclude and isolate employees of a particular race or ethnic group. Our society is too complex, and the factual permutations far too diverse, to permit the imposition of a universal rule by judicial fiat.[14]

The opinion gives an important insight into the types of problems we are creating

My grandfather, who was a physician, even segregated his patients by class. Next to the doorbell, a mirror reflected the image of the visitor to a basement window. The maid, before opening, took a quick look and, judging by style of dress or previous acquaintance, decided whether to take the patient to a sparsely furnished working-class waiting room where nothing but Flemish was spoken, or to the plush family parlor where only French was heard. My grandfather even had separate consulting rooms for his two classes of patients; his entire social and professional life was rigidly segregated, both linguistically and socially. *Id.*

10. *See generally* D. Horowitz, *Ethnic Groups in Conflict* (1985).

11. Rodriguez, the son of Mexican immigrants who grew up in Sacramento in the 1950's, points out that he regarded Spanish, his native tongue, as "a private language," one associated with familial intimacy and private, rather than public, individuality. Rodriguez at 29. For Rodriguez, Spanish "would have been a dangerous language ... to have used at the start of my education ... [because it would have] reinforce[d] feelings of public separateness." *Id.* at 38.

12. Whatever objections Gutierrez may have had to the English-only rule, it was not that it impeded her ability to communicate with other employees or to perform her job effectively. Nor is there any doubt about her ability to comply with the rule. Gutierrez, who was born, raised and educated in the United States, is fluent in English. Her decision to speak Spanish during working hours was not an unavoidable consequence of her nationality or lack of education, but a matter of choice. No one disputes this.

13. Another employee of the Municipal Court tried to explain to the plaintiff why her speaking Spanish with other Latino co-workers alienated and insulted those who could not understand them: " 'I went to Alva [Gutierrez] and tried to explain to her, but she kept saying I was just upset that she was bilingual'.... I couldn't make her see how bad it feels when you know the people around you are purposely talking so that you cannot understand.' " Stewart at 8, col. 4.

14. The panel makes much of the fact that employees here were hired to be bilingual and that part of their responsibilities involved dealing with the Spanish-only speaking public across

for ourselves by failing to repudiate the rule the panel adopts. In response to the defendants' argument that non-Spanish-speaking supervisors will be unable to supervise employees who speak Spanish during working hours, the panel offers a facile solution: "employ Spanish-speaking supervisors." 838 F.2d at 1043. This "let them eat cake" attitude masks a very serious problem: By deciding to speak another language during working hours, employees can limit who may qualify for supervisorial positions. If fluency in a second language is the sine qua non of supervisorial status, employees who are not bilingual, including other people of color, will be effectively eliminated from consideration for these coveted positions. Given the natural competition for supervisorial posts, *Gutierrez* may well exacerbate racial tensions. It is incomprehensible to me that this result is being reached in the name of a law designed to promote ethnic and racial harmony in the workplace.

### Conclusion

The court errs gravely in failing to take this case en banc. I must therefore respectfully dissent.

the clerks' counter. This is a total red herring. The rule announced in this case covers far more than the peculiar situation at the Southeast Los Angeles Municipal Court. Under the majority's rationale, any two employees who speak the same second language and are working for the same employer can insist on conversing in that language during working hours.