## ESPINOZA ET VIR v. FARAH MANUFACTURING CO., INC.

No. 72–671. Argued October 10–11, 1973—
Decided November 19, 1973 ·

MARSHALL, J., delivered the opinion of the Court, in which

BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 96.

*George Cooper* argued the cause for petitioners. With him on the briefs was *Ruben Montemayor*.

*Kenneth R. Carr* argued the cause for respondent. With him on the brief were *Jack T. Chapman* and *William Duncan.*\*

MR. JUSTICE MARSHALL delivered the opinion of the Court.

This case involves interpretation of the phrase "national origin" in Tit. VII of the Civil Rights Act of 1964. Petitioner Cecilia Espinoza is a lawfully admitted resident alien who was born in and remains a citizen of Mexico. She resides in San Antonio, Texas, with her husband, Rudolfo Espinoza, a United States citizen. In July 1969, Mrs. Espinoza sought employment as a seamstress at the San Antonio division of respondent Farah Manufacturing Co. Her employment application was rejected on the basis of a longstanding company policy against the employment of aliens. After exhausting their administrative remedies with the Equal Employment Opportunity Commission,[1] petitioners commenced this suit in the District Court alleging that respondent had discriminated against Mrs. Espinoza because of her "national origin" in violation of § 703 of Tit. VII, 78 Stat. 255, 42 U. S. C. § 2000e-2 (a)(1). The District Court granted petitioners' motion for summary judgment, hold-

---

\*Briefs of *amici curiae* urging reversal were filed by *Joseph T. Eddins, Jr.,* and *Beatrice Rosenberg* for the Equal Employment Opportunity Commission; by *Mario G. Obledo* and *Sanford Jay Rosen* for the Mexican American Legal Defense and Educational Fund; and by *Kenneth Hecht* for the Employment Law Center.

[1] Section 706 (c), 42 U. S. C. § 2000e-5 (e).

ing that a refusal to hire because of lack of citizenship constitutes discrimination on the basis of "national origin." 343 F. Supp. 1205. The Court of Appeals reversed, concluding that the statutory phrase "national origin" did not embrace citizenship. 462 F. 2d 1331. We granted the writ to resolve this question of statutory construction, 411 U. S. 946, and now affirm.

Section 703 makes it "an unlawful employment practice for an employer . . . to fail or refuse to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin." Certainly the plain language of the statute supports the result reached by the Court of Appeals. The term "national origin" on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.[2]

The statute's legislative history, though quite meager

---

[2] See, e. g., Minnesota State Act Against Discrimination, Minn. Stat. § 363.01, subd. 6 (1971), defining "national origin" as "the place of birth of an individual or of any of his lineal ancestors."

Several States have statutes making it illegal to discriminate on the basis of national origin, and many of these statutes have apparently been interpreted by the appropriate state enforcement agency as not barring citizenship requirements. For example, the New York Human Rights Law provides that it is an unlawful discriminatory practice to refuse to hire any individual because of his or her origin and additionally provides that it shall be unlawful for an employer to make any pre-employment inquiry "which expresses directly or indirectly, any limitation, specification or discrimination as to . . . national origin . . . ." N. Y. Exec. Law § 296 (1972). The New York State Commission Against Discrimination has ruled that an employer may lawfully ask a job applicant whether he or she is a citizen of the United States. See 3 CCH Employment Prac. Guide ¶ 26,051, p. 8899.

While these interpretations of state statutes do not control our construction of federal law, we think them indicative of a general understanding that the term "national origin" does not embrace a requirement of United States citizenship.

in this respect, fully supports this construction. The only direct definition given the phrase "national origin" is the following remark made on the floor of the House of Representatives by Congressman Roosevelt, Chairman of the House Subcommittee which reported the bill: "It means the country from which you or your forebears came. . . . You may come from Poland, Czechoslovakia, England, France, or any other country." 110 Cong. Rec. 2549 (1964). We also note that an earlier version of § 703 had referred to discrimination because of "race, color, religion, national origin, or *ancestry*." H. R. 7152, 88th Cong., 1st Sess., § 804, Oct. 2, 1963 (Comm. print) (emphasis added). The deletion of the word "ancestry" from the final version was not intended as a material change, see H. R. Rep. No. 914, 88th Cong., 1st Sess., 87 (1963), suggesting that the terms "national origin" and "ancestry" were considered synonymous.

There are other compelling reasons to believe that Congress did not intend the term "national origin" to embrace citizenship requirements. Since 1914, the Federal Government itself, through Civil Service Commission regulations, has engaged in what amounts to discrimination against aliens by denying them the right to enter competitive examination for federal employment. Exec. Order No. 1997, H. R. Doc. No. 1258, 63d Cong., 3d Sess., 118 (1914); see 5 U. S. C. § 3301; 5 CFR § 338.101 (1972). But it has never been suggested that the citizenship requirement for federal employment constitutes discrimination because of national origin, even though since 1943, various Executive Orders have expressly prohibited discrimination on the basis of national origin in Federal Government employment. See, *e. g.,* Exec. Order No. 9346, 3 CFR 1280 (Cum. Supp. 1938–1943); Exec. Order No. 11478, 3 CFR 446 (1970).

Moreover, § 701 (b) of Tit. VII, in language closely paralleling § 703, makes it "the policy of the United States to insure equal employment opportunities for Federal employees without discrimination because of . . . national origin . . . ." Civil Rights Act of 1964, Pub. L. 88–352, § 701 (b), 78 Stat. 254, re-enacted, Pub. L. 89–554, 80 Stat. 523, 5 U. S. C. § 7151. The legislative history of that section reveals no mention of any intent on Congress' part to reverse the longstanding practice of requiring federal employees to be United States citizens. To the contrary, there is every indication that no such reversal was intended. Congress itself has on several occasions since 1964 enacted statutes barring aliens from federal employment. The Treasury, Postal Service, and General Government Appropriation Act, 1973, for example, provides that "no part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States . . . unless such person (1) is a citizen of the United States . . . ." [3] Pub. L. 92–351, § 602, 86 Stat. 487. See also Pub. L. 91–144, § 502, 83 Stat. 336; Pub. L. 91–439, § 502, 84 Stat. 902.

To interpret the term "national origin" to embrace citizenship requirements would require us to conclude that Congress itself has repeatedly flouted its own declaration of policy. This Court cannot lightly find

[3] Petitioners argue that it is unreasonable to attribute any great significance to these provisions in determining congressional intent because the barrier to employment of noncitizens has been tucked away in appropriations bills rather than expressed in a more affirmative fashion. We disagree. Indeed, the fact that Congress has occasionally enacted exceptions to the general barrier indicates to us that Congress was well aware of what it was doing. See, *e. g.,* Pub. L. 92–204, § 703, 85 Stat. 726 (Dept. of Defense); Pub. L. 91–382, 84 Stat. 823 (Library of Congress).

such a breach of faith. See *Bate Refrigerating Co.* v. *Sulzberger,* 157 U. S. 1, 38 (1895). So far as federal employment is concerned, we think it plain that Congress has assumed that the ban on national-origin discrimination in § 701 (b) did not affect the historical practice of requiring citizenship as a condition of employment. See *First National Bank* v. *Missouri,* 263 U. S. 640, 658 (1924). And there is no reason to believe Congress intended the term "national origin" in § 703 to have any broader scope. Cf. *King* v. *Smith,* 392 U. S. 309, 330–331 (1968).

Petitioners have suggested that the statutes and regulations discriminating against noncitizens in federal employment are unconstitutional under the Due Process Clause of the Fifth Amendment. We need not address that question here,[4] for the issue presented in this case is not whether Congress has the power to discriminate against aliens in federal employment, but rather, whether Congress intended to prohibit such discrimination in private employment. Suffice it to say that we cannot conclude Congress would at once continue the practice of requiring citizenship as a condition of federal employment and, at the same time, prevent private employers from doing likewise. Interpreting § 703 as petitioners suggest would achieve the rather bizarre result of preventing Farah from insisting on United States citizenship as a condition of employment while the very agency charged with enforcement of Tit. VII would itself be required by Congress to place such a condition on its own personnel.

---

[4] We left this question undecided in *Sugarman* v. *Dougall,* 413 U. S. 634, 646 n. 12 (1973). See *Jalil* v. *Hampton,* 148 U. S. App. D. C. 415, 460 F. 2d 923, cert. denied, 409 U. S. 887 (1972); *Mow Sun Wong* v. *Hampton,* 333 F. Supp. 527 (ND Cal. 1971).

The District Court drew primary support for its holding from an interpretative guideline issued by the Equal Employment Opportunity Commission which provides:

"Because discrimination on the basis of citizenship has the effect of discriminating on the basis of national origin, a lawfully immigrated alien who is domiciled or residing in this country may not be discriminated against on the basis of his citizenship . . . ."  29 CFR § 1606.1 (d) (1972).

Like the Court of Appeals, we have no occasion here to question the general validity of this guideline insofar as it can be read as an expression of the Commission's belief that there may be many situations where discrimination on the basis of citizenship would have the effect of discriminating on the basis of national origin.  In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination.  In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination.  Certainly Tit. VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin.  "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 431 (1971).

It is equally clear, however, that these principles lend no support to petitioners in this case.  There is no indication in the record that Farah's policy against employment of aliens had the purpose or effect of discriminating against persons of Mexican national origin.[5]  It is con-

---

[5] There is no suggestion, for example, that the company refused to hire aliens of Mexican or Spanish-speaking background while

ceded that Farah accepts employees of Mexican origin, provided the individual concerned has become an American citizen. Indeed, the District Court found that persons of Mexican ancestry make up more than 96% of the employees at the company's San Antonio division, and 97% of those doing the work for which Mrs. Espinoza applied. While statistics such as these do not automatically shield an employer from a charge of unlawful discrimination, the plain fact of the matter is that Farah does not discriminate against persons of Mexican national origin with respect to employment in the job Mrs. Espinoza sought. She was denied employment, not because of the country of her origin, but because she had not yet achieved United States citizenship. In fact, the record shows that the worker hired in place of Mrs. Espinoza was a citizen with a Spanish surname.

The Commission's guideline may have significance for a wide range of situations, but not for a case such as this where its very premise—that discrimination on the basis of citizenship has the effect of discrimination on the basis of national origin—is not borne out.[6] It is

---

hiring those of other national origins. Respondent's president informed the EEOC's Regional Director investigating the charge that once in its history the company had made a single exception to its policy against hiring aliens, but the nationality of the individual concerned is not revealed in the record. While the company asks job applicants whether they are United States citizens, it makes no inquiry as to their national origin.

[6] It is suggested that a refusal to hire an alien always disadvantages that person because of the country of his birth. A person born in the United States, the argument goes, automatically obtains citizenship at birth, while those born elsewhere can acquire citizenship only through a long and sometimes difficult process. See 8 U. S. C. §§ 1423 (1), 1423 (2), 1427 (a), and 1430. The answer to this argument is that it is not the employer who places the burdens of naturalization on those born outside the country, but Congress itself, through laws enacted pursuant to its constitutional power

also significant to note that the Commission itself once held a different view as to the meaning of the phrase "national origin." When first confronted with the question, the Commission, through its General Counsel, said: " 'National origin' refers to the country from which the individual or his forebears came . . . , not to whether or not he is a United States citizen . . . ." EEOC General Counsel's Opinion Letter, 1 CCH Employment Prac. Guide ¶ 1220.20 (1967).[7] The Commission's more recent interpretation of the statute in the guideline relied on by the District Court is no doubt entitled to great deference, *Griggs* v. *Duke Power Co., supra,* at 434; *Phillips* v. *Martin Marietta Corp.,* 400 U. S. 542, 545 (1971) (MARSHALL, J., concurring), but that deference must have limits where, as here, application of the guideline would be inconsistent with an obvious congressional intent not to reach the employment practice in question. Courts need not defer to an administrative construction of a statute where there are "com-

---

"[t]o establish an uniform Rule of Naturalization." U. S. Const., Art. 1, § 8, cl. 4.

Petitioners' reliance on *Phillips* v. *Martin Marietta Corp.,* 400 U. S. 542 (1971), is misplaced for similar reasons. In *Phillips* we held it unlawful under § 703 to have "one hiring policy for women and another for men . . . ." *Id.,* at 544. Farah, however, does not have a different policy for the foreign born than for those born in the United States. It requires of all that they be citizens of the United States.

[7] The Opinion Letter was addressed to the question whether it was lawful to discriminate against nonresident aliens in favor of citizens and resident aliens, and expressly reserved any decision "regarding discrimination in favor of United States citizens and against resident aliens." Nevertheless, the definition of "national origin" set forth in the Letter is inconsistent with that suggested by petitioners here.

pelling indications that it is wrong." *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381 (1969); see also *Zuber* v. *Allen,* 396 U. S. 168, 193 (1969); *Volkswagenwerk Aktiengesellschaft* v. *FMC,* 390 U. S. 261, 272 (1968).

Finally, petitioners seek to draw support from the fact that Tit. VII protects all individuals from unlawful discrimination, whether or not they are citizens of the United States. We agree that aliens are protected from discrimination under the Act. That result may be derived not only from the use of the term "any individual" in § 703, but also as a negative inference from the exemption in § 702, which provides that Tit. VII "shall not apply to an employer with respect to the employment of aliens outside any State . . . ." 42 U. S. C. § 2000e–1. Title VII was clearly intended to apply with respect to the employment of aliens inside any State.[8]

The question posed in the present case, however, is not whether aliens are protected from illegal discrimination under the Act, but what kinds of discrimination the Act makes illegal. Certainly it would be unlawful for an employer to discriminate against aliens because of race, color, religion, sex, or national origin—for example, by hiring aliens of Anglo-Saxon background but refusing to hire those of Mexican or Spanish ancestry. Aliens are protected from illegal discrimination under the Act, but nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage.

We agree with the Court of Appeals that neither the language of the Act, nor its history, nor the specific

---

[8] "Title VII of the Civil Rights Act of 1964 protects all individuals, both citizens and noncitizens, domiciled or residing in the United States, against discrimination on the basis of race, color, religion, sex, or national origin." 29 CFR § 1606.1 (c) (1972).

facts of this case indicate that respondent has engaged in unlawful discrimination because of national origin.[9]

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

It is odd that the Court which holds that a State may not bar an alien from the practice of law [1] or deny employment to aliens [2] can read a federal statute that prohibits discrimination in employment on account of "national origin" so as to permit discrimination against aliens.

Alienage results from one condition only: being born outside the United States. Those born within the country are citizens from birth. It could not be more clear that Farah's policy of excluding aliens is *de facto* a policy of preferring those who were born in this country. Therefore the construction placed upon the "national origin" provision is inconsistent with the construction this Court has placed upon the same Act's protections for persons denied employment on account of race or sex.

In connection with racial discrimination we have said that the Act prohibits "practices, procedures, or tests neutral on their face, and even neutral in terms of intent," if they create "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate in-

---

[9] Petitioners argue that respondent's policy of discriminating against aliens is prohibited by 42 U. S. C. § 1981, which provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." This issue was neither raised before the courts below nor presented in the petition for a writ of certiorari. Accordingly we express no views thereon.

[1] *In re Griffiths,* 413 U. S. 717 (1973).

[2] *Sugarman* v. *Dougall,* 413 U. S. 634 (1973).

vidiously to discriminate on the basis of racial *or other impermissible classification."*  *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 430–431 (1971) (emphasis added).  There we found that the employer could not use test or diploma requirements which on their face were racially neutral, when in fact those requirements had a *de facto* discriminatory result and the employer was unable to justify them as related to job performance.  The tests involved in *Griggs* did not eliminate all blacks seeking employment, just as the citizenship requirement here does not eliminate all applicants of foreign origin. Respondent here explicitly conceded that the citizenship requirement is imposed without regard to the alien's qualifications for the job.

These petitioners against whom discrimination is charged are Chicanos.  But whether brown, yellow, black, or white, the thrust of the Act is clear: alienage is no barrier to employment here.  *Griggs,* as I understood it until today, extends its protective principles to all, not to blacks alone.  Our cases on sex discrimination under the Act yield the same result as *Griggs.* See *Phillips* v. *Martin Marietta Corp.,* 400 U. S. 542 (1971).

The construction placed upon the statute in the majority opinion is an extraordinary departure from prior cases, and it is opposed by the Equal Employment Opportunity Commission, the agency provided by law with the responsibility of enforcing the Act's protections.  The Commission takes the only permissible position: that discrimination on the basis of alienage *always* has the effect of discrimination on the basis of national origin.  Refusing to hire an individual because he is an alien "is discrimination based on birth outside the United States and is thus discrimination based on national origin in violation of Title VII."  Brief

for Commission as *Amicus Curiae* 5. The Commission's interpretation of the statute is entitled to great weight.

There is no legislative history to cast doubt on this construction.[3] Indeed, any other construction flies in the face of the underlying congressional policy of removing "artificial, arbitrary, and unnecessary barriers to employment." *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 806 (1973).

Mrs. Espinoza is a permanent resident alien, married to an American citizen, and her children will be native-born American citizens. But that first generation has the greatest adjustments to make to their new country. Their unfamiliarity with America makes them the most vulnerable to exploitation and discriminatory treatment. They, of course, have the same obligation as American citizens to pay taxes, and they are subject to the draft on the same basis. But they have never received equal treatment in the job market. Writing of the immigrants of the late 1800's, Oscar Handlin has said:

> "For want of alternative, the immigrants took the lowest places in the ranks of industry. They suffered in consequence from the poor pay and miserable working conditions characteristic of the sweat-

---

[3] The only legislative history the majority points to is Congressman Roosevelt's definition of "national origin": "It means the country from which you or your forebears came. . . . You may come from Poland, Czechoslovakia, England, France, or any other country." *Ante,* at 89. But that only makes clear what petitioners here argue—that Mrs. Espinoza cannot be discriminated against because she comes from a foreign country. The majority's mention of the deletion of the word "ancestry," *ibid.,* is certainly irrelevant. Obviously "national origin" comprehends "ancestry," but as Congressman Roosevelt pointed out it means more—not only where one's forebears were born, but where one himself was born.

shops and the homework in the garment trades and in cigar making. But they were undoubtedly better off than the Irish and Germans of the 1840's for whom there had been no place at all." The New-comers 24 (1959).

The majority decides today that in passing sweeping legislation guaranteeing equal job opportunities, the Congress intended to help only the immigrant's children, excluding those "for whom there [is] no place at all." I cannot impute that niggardly an intent to Congress.