Calvin J. ROACH

v.

**DRESSER INDUSTRIAL VALVE AND INSTRUMENT DIVISION, a division of Dresser Industries, Inc.**

**Civ. A. No. 780157.**

United States District Court,
W. D. Louisiana,
Alexandria Division.

July 17, 1980.

---

Daniel E. Broussard, Jr., Alexandria, La., for plaintiff.

Richard B. Sadler, Jr., Provosty, Sadler & deLaunay, Alexandria, La., Peter J. Carre, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., for defendant.

EDWIN F. HUNTER, Jr., District Judge:

Invoking Title VII, the Equal Employment Opportunity Act, 42 U.S.C. § 2000e–2, Calvin Roach, a native born American of Acadian descent, challenges as discriminatory his employment termination with Dresser Industries. He alleges that his employment was terminated on March 31, 1977, because of his national origin and his association with co-employees of the same national origin (Acadians, or "Cajuns").

The key provision of Title VII is Section 703(a) of the Act, which provides that:
"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin * * *."

The statute's legislative history concerning the meaning of "national origin" is quite meager, but the Supreme Court has noted that the term refers not to alienage, but "to the country where a person was born, or, more broadly, the country from which is or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287. The legislative history enunciates precisely that a person's national origin has nothing to do with color, religion, or race.

Defendant concedes that if plaintiff had alleged that he was discharged because his ancestors came from England, Poland, Canada, Iran, Spain, Germany, Russia, Mexico or any other country, then plaintiff should certainly be given an opportunity to proceed to trial on the merits. Defendant also concedes that it would be a violation of Title VII if a German employer with a plant in Pennsylvania discriminated against local residents because they and/or their ancestors came from the United States. However, Dresser insists that since Acadia is not and never was a country, plaintiff has no standing under Title VII to bring this action.

The first problem one should address is that of definition. Controversy, emotionalism and the import of Longfellow's "Evangeline" have contributed to many stereotyped and oversimplified characterizations of the Acadian people. In the context of this litigation we agree with Dr. Arceneaux and Mr. James Domengeaux (Chairman of CODOFIL) that a "Cajun" is properly defined as an Acadian, and that one is a "Cajun" only if his ancestry includes someone who once lived in Acadia. Under this definition we find that Mr. Roach is a "Cajun" and an Acadian. Two former Governors of Louisiana fit this definition—Paul O. Hebert and Alexandre Mouton. In this same category are two former United States Senators—Robert and Edwin S. Broussard—and five former members of the United States Congress—Whit P. Martin, Numa Montet, Robert L. Mouton, Garland Dupre and James Domengeaux.[1]

---

1. Many people living in Southwestern Louisiana consider themselves to be Cajuns despite the fact that they may not trace their ancestry to the colony of Acadia (Tr. 76, Hebert). Moreover, these people are considered by others to be Cajuns. Such a definition transcends traditional boundaries such as national origin, which is often the basis for formation of ethnic groups. It also stresses the openness so characteristic of South Louisiana (Tr. 244, Joubert),

The evidence reveals that in 1604 a small group of Frenchmen from Normandy, Picardy, and Anjou arrived in the French Colony of "Acadia." In 1620, when King James I extended the British colony of Massachusetts to include all of Acadia, which he renamed "Nova Scotia," he sent some Scots to colonize that area and many of them intermarried with the French who were already there. The emigration of Frenchmen to Acadia increased. The British returned Acadia to the French in 1632. In 1654 Acadia was reclaimed by the British, and many "Acadians" returned to France. In 1667, by the Treaty of Breda, Acadia was once again returned to France. In 1690, Nova Scotia was made a part of the British colony of Massachusetts. Thereafter, it was captured by the French in 1691 and by the English in 1710. In 1713, the Treaty of Utrecht put "Acadia," then known only as "Nova Scotia," permanently into the hands of the British. Long before the Treaty of Utrecht, the French-speaking residents of Acadia had become a multi-national group. A census taken in 1671 listed fifty-nine family heads. The people listed on that census were the founding fathers of the "Acadian people," and included two Scots named Mellanson (now Melancon), an Irishman named Kuessey (Caissey or Quesay), and an Englishman named Granger.[2] Although they spoke French, they had developed new customs, and by 1700 the descendants of the first settlers of Acadia considered themselves to be a new people—the Acadians. In fact, although the Acadians seldom intermarried, an Irishman or Scot who moved to the colony of Nova Scotia would, after several years, take on the identity of the Acadians. These persons from other countries were absorbed by the French element and spoke French. They considered themselves to be Acadians as long as they had been born and raised in that colony.

The French-speaking residents who remained in Acadia after 1713 were asked to sign an oath of allegiance to the King of England. In 1720 and 1726, after they signed conditional oaths by which they swore allegiance to England but refused to bear arms in defense of England against France, they became known as French Neutrals. Later, when war between England and France seemed inevitable and the British became anxious about the large number of persons in Acadia who would not pledge themselves to bear arms on its behalf against France, the French Neutrals were asked to sign an unconditional oath of allegiance to England. Refusal to comply carried the penalty of confiscation of all property and deportation. As expected, the Acadians rejected the oath, and in 1755 the inevitable resulted: properties were confiscated, families were scattered, and the Acadians were loaded on ships destined for exile in the British colonies. Others were transported by the British to England, and later by arrangement with the French Crown, were taken to France where they established themselves in Normandy.

Many of the deported exiles eventually made their way from the various British colonies to the Spanish colony of Louisiana,[3] where they were well-received. The first exiles from Acadia reached Louisiana in 1764, ten years after the deportation. Between 1764 and 1767 hundreds of them emigrated to Louisiana. The largest movement of Acadians back to the American continent occurred in 1785 when more than

but in the context of "national origin" this definition may not be utilized in this litigation. In this latter category, according to the testimony of Dr. Arceneaux and Mr. Domengeaux, is the Honorable Edwin Edwards, who served as Governor of Louisiana from 1972–80.

**2.** Subsequent census records indicate that in 1714 the population had reached 2,500 and by 1755 had increased to 16,000.

**3.** By the Treaty of Fountainbleu (1762), France ceded the colony of Louisiana to Spain. Louisiana remained a Spanish colony until 1803 when it was ceded to Napoleon and then sold in the Louisiana Purchase.

1,600 Acadians were transported from France to Louisiana at the expense of the Spanish Crown.[4]

Defendant's first contention in this regard is that since Acadia is not and never was an independent nation, it could not be plaintiff's "national origin." Distinctions between citizens solely because of their ancestors are odious to a free people whose institutions are founded upon the doctrine of equality, and we decline to accept the argument that litigation of this sort should be governed by the principles of sovereignty.

We conclude that plaintiff is protected by Title VII's ban on national origin discrimination. The Louisiana Acadian is alive and well. He is "up front" and "main stream." He is not asking for any special treatment. By affording coverage under the "national origin" clause of Title VII he is afforded no special privilege. He is given only the same protection as those with English, Spanish, French, Iranian, Czechoslavakian, Portuguese, Polish, Mexican, Italian, Irish, et al., ancestors.

The case will be heard on its merits.

---

4. The New Orleans Times-Picayune of November 9, 1975 reviewed this migration:

"Everybody was happy it seems—the Acadians for a fresh start in Louisiana with lands to cultivate and livestock with which to start farming. The Spanish authorities were delighted. The Intendant Martin Navarro reported to Madrid: 'I can assure you that after four years these Acadians will be America's most prosperous and sturdist colonists, because they love their new home, and determined to give Louisiana in 1786 its best harvest.' And Gov. Miro wrote Bernardo de Galvez in Cuba: 'The enthusiasm, industry and loyalty of these new colonists will boost the prosperity of our province and increase its local and foreign trade.'"