Russell **GOYETTE**, Bernice Rice Gerstein, Irving Benig, Judith Teller and Robert Ross, Plaintiffs,

v.

**DCA ADVERTISING INC., and Dentsu Inc., Defendants.**

Julius **FILICIA**, Plaintiff,

v.

**DCA ADVERTISING INC., and Dentsu Inc., Defendants.**

Nos. 91 Civ. 3518(KC), 92 Civ. 1425(KC).

United States District Court, S.D. New York.

July 30, 1993.

---

Cary Bricker, Judith Vladeck, and Debra Raskin, Vladeck Waldman Elias & Engelhard, New York City, for plaintiffs.

Howard S. Veisz, Kornstein Veisz & Wexler, New York City, for defendants.

## OPINION AND ORDER

CONBOY, District Judge.

Dentsu Inc. ("Dentsu") is an advertising and communications company based in Tokyo. In 1983, Dentsu entered into a joint venture with an American advertising agency, Young and Rubicam ("Y & R"), to form a new advertising agency named DYR. Three years later, Y & R sold its 50% interest in DYR to Dentsu. Dentsu then renamed the agency DCA. DCA, an American corporation, is a wholly owned subsidiary of Dentsu, with offices in New York City and Los Angeles.

All of the plaintiffs in this case are American-born former employees of DCA in its New York office.[1] In September of 1990, from a total work force of 144, defendants discharged all of the plaintiffs and seventeen other American employees (a total of 22 Americans).[2] Claiming that defendants discriminated against plaintiffs based upon plaintiffs' national origin, the plaintiffs are suing the defendants under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* ("Title VII") and the New York State Human Rights Law, Executive Law § 290 *et seq.* ("Human Rights Law").[3] DCA has now moved for summary judgment. For the reasons that follow, DCA's motion for summary judgment is denied in part and granted in part.

## Background

As each of the plaintiffs must prove discrimination with respect to his or her individual termination, we will briefly discuss each plaintiff's employment history with DCA and the context of his or her discharge. Viewing the record in the light most favorable to the plaintiffs, the following are the facts of this case.

### 1. *Goyette*

Russell Goyette ("Goyette") was hired in April 1985 by DYR. In June 1985, DYR named Goyette Vice President. In April 1986, he received a salary increase of * * *▮, and in April 1987 he received another salary increase of * * *. *See* Goyette Affidavit ("Goyette Aff.") ¶ 3. When Dentsu acquired all of DYR and renamed it DCA, Y & R took the Heublein account on which Goyette had been working. Consequently, the Heublein management requested that Goyette be transferred to Y & R to continue servicing the Heublein brands. DCA management,

---

**1.** The parties have agreed to a resolution of the claims of Robert Ross ("Ross"). A final executed agreement, regarding the settlement of Ross' claims has been signed by Ross, DCA, and Dentsu. Accordingly, on July 14, 1993 the Court ordered that Ross' claims be dismissed with prejudice.

**2.** DCA claims that it also fired one Japanese woman, Mineko Muranaka ("Muranaka") in September of 1990. *See* McDonagh Aff. ¶ 21. The plaintiffs, however, assert that Muranaka had previously advised DCA management of her desire to return to Japan, and thus voluntarily left the company. *See* Deposition of C. Ray Freeman at 106–107 Raskin Aff., Ex. S. The statement of Ray Freeman, Executive Vice President, Chief Operating Officer of DCA, is an exception to the hearsay rule under Rule 801(d)(2)(D) of the Federal Rules of Evidence (admission of agent of a party). For purposes of this motion, the Court must view the facts in the light most favorable to the plaintiffs, and therefore will assume that Muranaka left DCA of her own free will. We observe, however, that the other sources that the

plaintiff cites in support of the voluntary nature of Muranaka's leave of DCA (Deposition of Judith Teller at 51–54, Raskin Aff. Ex. L; Goyette Dep. at 174–78, Raskin Aff., Ex. J; Benig Aff. ¶ 25) are either hearsay or double hearsay and therefore inadmissible.

**3.** The plaintiffs assert that DCA and Dentsu demonstrated favoritism to both Japanese expatriates and Americans of Japanese descent. We observe that both types of favoritism may be actionable under the broad definition of "national origin" in federal and state law. *See Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88, 94 S.Ct. 334, 336, 38 L.Ed.2d 287 (1973) ("[t]he term 'national origin' on its face refers to the country where a person was born, or more broadly, the country from which his or her ancestors came"); *see also* New York State Executive Law § 292 subd. 8 (national origin is defined to include ancestry).

however, asked Goyette to stay with DCA. DCA felt that Goyette's marketing expertise would be valuable in attracting and servicing new clients. *See id.* at ¶ 5. Goyette remained with DCA. *See id.* at ¶ 6. In February 1988, DCA promoted Goyette to Vice President, Group Account Director of DCA. In that position, he supervised numerous accounts, including Japan Airlines, Nikko Hotels, Shiseido Cosmetics, Mikimoto Jewelry, and Sanyo Fashion House. Goyette received a * * * salary increase in 1988, followed by a * * * salary increase in 1989. He also received performance based bonuses: * * * in 1989, and * * * in May of 1990. *See id.* at ¶ 6.

In September of 1990, DCA terminated Goyette. DCA chose to retain Nick Nakahara ("Nakahara"), a Japanese–American [4] and the only other Vice President, Group Account Director, over Goyette, even though the two performed equivalently.[5] Additionally, after Goyette's discharge, DCA assigned Goyette's duties on Japan Airlines and Nikko Hotels to his former subordinates Kazuhide Ishii ("Ishii"), a Dentsu expatriate, and Chris Yamaguchi ("Yamaguchi"), a Japanese–American. *See* Affidavit of Debra Raskin ("Raskin Aff."), Exhibit C at 981. DCA also transferred Goyette's work on Shiseido and the other fashion accounts to Mariko Kobayashi ("Kobayashi"), a Japanese–American. *See* Teller Aff. at ¶ 8.

After his discharge, Goyette approached DCA's President, Toshio Naito ("Naito") to complain about his discharge and the favoritism with which DCA treated its Japanese employees. Goyette also asked Naito for alternative employment with another Dentsu affiliate. In response, Naito told him, "I'm sorry. We have to treat Americans and Japanese differently. We have to favor the Japanese." *Id.* at ¶ 21.

### 2. Benig

In September of 1988, DCA hired Irving Benig ("Benig") as a Vice President with three areas of responsibility: (1) staffing of the creative department as Group Creative Director; (2) attracting new business as Chair of the New Business Committee; and (3) expanding DCA's sales promotion service. *See* Affidavit of Irving Benig ("Benig Aff.") ¶¶ 4–6. Benig received praise from Naito and the General Manager of DCA, Kiyoshi Eguchi ("Eguchi"), for his work in each of these capacities. In March 1989, Benig received a * * * pay increase. *See id.* at ¶ 11.

In September of 1989, DCA promoted Benig to Vice President, Manager of Creative Services/Group Creative Director. *See id.* at ¶ 12. Shortly thereafter, however, DCA lost the Canon camera account on which Benig had been working. As a result, Eguchi instructed Benig to lay off one employee from the creative department who had worked on that account. Had Benig been free to lay off any employee of his choosing, Benig would have discharged Kunimasa Hatachi ("Hatachi"), a Japanese employee and a Dentsu expatriate. *See id.* at ¶ 22. Instead, however, Eguchi forced Benig to lay off a non-Japanese employee.

In December 1989, Benig's position changed again when Eguchi asked Benig to create and direct a formal sales promotion division. *See id.* at ¶ 6. Benig made many efforts so that this new department would grow and succeed. *See id.* at ¶ 14. In May or June of 1990, Naito told Benig that Naito was pleased with the progress that Benig had made in this new area. On May 31, 1990, Benig received a * * * bonus. *See id.* at ¶ 15.

In September of 1990, DCA terminated Benig's employment. Subsequently, DCA placed Muneharu Tokura ("Tokura"), a Japanese expatriate, in charge of a collateral advertising component of sales promotion,

---

4. It is unclear from the record whether the non-Dentsu expatriates with Japanese surnames are Japanese or American citizens. For the purposes of this motion, we will refer to these employees as "Japanese–Americans." Whether they are citizens of Japan or the United States is not material to this motion and can be established at trial.

5. Looking at DCA's Statement of Client Profitability For The Four Months Ended July 31, 1990, we observe that the accounts of Goyette and Nakahara were of comparable profitability. *See* Raskin Aff., Ex. N.

which served a function similar to that of Benig's former position.[6] Consequently, Tokura assumed many of Benig's duties. However, Tokura, a Japanese expatriate, had received poor evaluations from his supervisors before assuming this new role. McDonagh stated that he was "[u]nimpressed" with Tokura's work and that he did not think Tokura had any "ability to work culturally in the United States." *See* McDonagh Dep. at 64, Raskin Aff., Ex. E.

### 3. *Teller*

DCA hired Judith Teller ("Teller") in October 1988 as an Associate Creative Director. Although Teller had a background in copywriting, while others in her position had backgrounds in art, all Associate Creative Directors had the same responsibilities and worked together. *See* Teller Aff. ¶¶ 11–12 and Ex. B at 338. One year after DCA hired Teller, DCA gave Teller a salary increase of * * *, and shortly after that, DCA gave Teller a bonus of * * *. *See* Teller Aff. ¶ 1. Teller worked on two of the important advertising campaigns for the Canon account ("The Heart of Technology" and "Shoot it Hot"). *See id.* at ¶¶ 2–3. In March of 1990, Teller received a written performance evaluation, reviewed by Eguchi, which ranked her overall work as 4 or "exceeds standards" on a scale of 1 to 5. *See id.* Ex. B at 343.

In September of 1990, DCA fired Teller. At that time, Joseph McDonagh ("McDonagh"), Director of Creative Services, told her that he would provide her a good reference. *See id.* at ¶ 14. Additionally, DCA retained Japanese employees in the Creative Department who were arguably less qualified than Teller. Hiroaki Yamada ("Yamada"), a Japanese expatriate and Creative Supervisor, was retained despite McDonagh's description of Yamada's work as "terrible" and "weak." *See* McDonagh Dep. at 88, Raskin Aff., Ex. E. Similarly, DCA retained Hatachi, another expatriate Creative Supervisor, who McDonagh thought to be incompetent. *See* Teller Aff. ¶ 9.

### 4. *Filicia*

In May 1989, DCA hired Julius Filicia ("Filicia") as an Assistant Art Director. Approximately one year later, he received a * * * raise. *See* Filicia Aff. ¶ 2. On March 29, 1990, Filicia received an evaluation which gave him an overall ranking of 4.25, between 4, "exceeds standards," and 5, "exceptional," on a scale of 1 to 5. *See id.* Ex. A at 2124.

In September of 1990, DCA fired Filicia. At that time, McDonagh told Filicia that Filicia's termination had nothing to do with Filicia's performance and that McDonagh would provide Filicia with a good recommendation. *See id.* at ¶ 7.

All of the Americans in Filicia's creative group, which included co-plaintiff Teller, had their employment terminated at the same time as Filicia. *See id.* DCA retained, however, Hatachi, an expatriate, and Mina Yamazaki ("Yamazaki"), a Japanese–American. *See id.* As discussed above, McDonagh was aware of Hatachi's poor performance, and he was openly critical of Yamazaki's performance. McDonagh did not "see any real valuable asset" in Yamazaki's work. *See* McDonagh Dep. at 176–177, Raskin Aff., Ex. E.

### 5. *Gerstein*

In March 1987, DCA hired Bernice Rice Gerstein ("Gerstein") as a Media Group Head. In November 1987, DCA promoted Gerstein to Associate Media Director, and in March 1988, DCA promoted Gerstein to Vice President, Associate Media Director. *See* Gerstein Aff. ¶ 2. In her position in the media department, Gerstein often worked with the account services department and the creative department to plan advertising campaigns and to formulate strategies. *See id.* at ¶ 4. Gerstein's position in the media department did not confine her work to that area. Although she and the employees in the other departments with which she worked held different titles, their positions required that they possess and utilize similar skills.

In March 1990, Gerstein received a performance evaluation of 4.5 (between "exceeds standards" and "exceptional") on a scale from 1 to 5. *See id.* Ex A at 300. In May 1990, Gerstein received a * * * bonus, and in July 1990, she received a * * * raise. *See id.* at ¶ 3. Additionally, Gerstein's supervisors

---

**6.** *See* Benig Affidavit ¶ 6 ("sales promotion activities encompass 'collateral' advertising").

praised her for being "an incredibly gifted writer." *See* Gerstein Aff., Ex. A at 305.

In September of 1990, DCA terminated Gerstein's employment. Steven Naftelberg ("Naftelberg"), Senior Vice President/Media & Market Research Services Director, told Gerstein that DCA did not base its termination decision on Gerstein's performance. *See id.* ¶ 10. At that time, however, DCA chose to retain four Japanese Management Supervisors in the Account Services Department, Ishii (an expatriate), Nakahara (a Japanese–American), Wataru Komaki ("Komaki") (an expatriate), and Mitsuhiro Fujisaki ("Fujisaki") (an expatriate). According to Norman Hajjar, Senior Vice President, Director of Client Services, none of the Japanese expatriates could write a basic document in English, and they were not able to serve their clients successfully in the United States. *See* Affidavit of Isaac Brooks ¶ 3.

## I. DCA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM OF DISPARATE TREATMENT IS DENIED BECAUSE PLAINTIFFS HAVE RAISED ISSUES OF MATERIAL FACT THAT SHOULD BE RESOLVED AT TRIAL

In evaluating a motion for summary judgment, a court must determine, based upon a review of the entire record, whether there are genuine issues of material fact. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). In determining when such a genuine issue of material fact has been raised, the court must construe the record in the light most favorable to the non-moving party. *See id.* Only if the court finds that no reasonable trier of fact could find for the non-moving party may the Court grant a motion for summary judgment. *See Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

The seminal case of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), sets forth the burdens on each party in a disparate treatment employment discrimination suit. The plaintiff has the burden of establishing a prima facie case of discrimination, which can be rebutted by the defendant's production of a legitimate, non-discriminatory reason for the employment decision. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The plaintiff has the ultimate burden of proving both that the defendant's explanation is a pretext, and that the real reason for the defendant's decision was to discriminate against the plaintiff. *See St. Mary's Honor Ctr. v. Hicks* —— U.S. ——, ——, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993). Thus, the plaintiff carries the burden of persuasion at all times in an employment discrimination case. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

To satisfy the requirements of the prima facie case of discrimination, the plaintiff in a discharge case must prove the following four elements: (1) that the plaintiff belongs to a protected group; (2) that the plaintiff was qualified for the position; (3) that the plaintiff was rejected from the position; and (4) that the discharge occurred in circumstances that give rise to an inference of discrimination. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987);[7] *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985). Replacement of the plaintiff by a member of a favored class is not a requirement of the prima facie case of discrimination in a firing case. Such a requirement is both unnecessary and "at odds with the policies underlying Title VII." *Meiri v. Dacon,* 759 F.2d at 995.

### A. The Plaintiffs Have Presented the Elements of the Prima Facie Case

The first and third elements of the plaintiffs' prima facie case are uncontested by the defendants. There is no dispute that the plaintiffs, as persons of American national origin, benefit from the protection of Title VII, *cf. McDonald v. Santa Fe Trail Transportation Company,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (Title VII bars racial discrimination against white persons as

---

7. Although the plaintiff in *Lopez* brought his action under 42 U.S.C. § 1981, the Court applied the same legal standards as applied in Title VII cases. *See Lopez* 831 F.2d at 1188.

well as non-whites), and there is no dispute that DCA fired the plaintiffs. With respect to the second and fourth elements of the prima facie case, however, material issues of fact remain in controversy.

■ DCA argues that the plaintiffs were not qualified for their respective jobs. However, the legal standard for qualification in a prima facie case is minimal. The plaintiff "only needs to demonstrate that she 'possesses the basic skills necessary for performance of [the] job.'" *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991) (*quoting Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978)).

■ The opinions of the supervisory personnel at DCA indicate that each of the plaintiffs has met this burden. *See Meiri,* 759 F.2d at 995 (employees can rely on the evaluations of supervisors to determine whether the employees are qualified for the positions from which they were fired). Goyette's history of bonuses and raises demonstrates that the supervisory personnel at DCA felt that Goyette was qualified for his position. Similarly, Benig's raise, bonus, and praise from his supervisors indicate that he too was qualified for the position from which he was discharged. In addition, the laudatory written performance evaluations of Teller and Filicia in the Spring of 1990 demonstrate their qualifications for positions in the Creative Department. Finally, Gerstein's promotions, bonuses, raises, and performance evaluations all demonstrate that she too was qualified for her position.

■ The fourth element of the plaintiffs' prima facie case, proof that the circum-stances of firings lead to an inference of discrimination is the critical element for this summary judgment motion. This proof is intimately intertwined with the plaintiffs' supplemental burden—proof that the defendant's explanation for the firings is a pretext for discrimination. Both aspects of the plaintiffs' case are supported by the same evidence, and thus, will be discussed together.[8]

## B. Defendant's Explanation for the Firing of Plaintiffs

DCA has set forth a legitimate, two-pronged explanation for the firing of the plaintiffs. As discussed above, DCA claims that it fired the plaintiffs because the plaintiffs were unqualified and were losing money for DCA. Additionally, DCA argues that it fired the plaintiffs as part of a company-wide program of personnel and loss reduction. In response, the plaintiffs have presented facts that suggest that their terminations were borne out of national origin discrimination, and that DCA's explanation for the firings is a pretext for such discrimination.

In support of their position, the plaintiffs cite several statements made by the Japanese supervisors. One such statement is that made by DCA's President, Naito, to Goyette regarding the preferential treatment of Japanese employees.[9] A second such statement is that made by DCA's General Manager, Eguchi, to Benig regarding Benig's inability to fire a Japanese employee from the Canon camera account.[10] A third such statement is that made to Andrew Kennedy ("Kennedy") by Fujisaki, a Vice President, Management Supervisor at DCA, in which Fujisaki advised Kennedy that Kennedy's "possibilities for promotion at DCA were limited because [he was] not Japanese." *See* Affidavit of Andrew Kennedy ¶ 3.[11] Al-

---

**8.** "The[] burdens of production and proof ... are not meant to be 'rigid, mechanistic, or ritualistic. The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally discriminated ... against the plaintiff ...'" *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990) (*quoting Wrighten v. Metropolitan Hosps., Inc.,* 726 F.2d 1346, 1354 (9th Cir.1984)).

**9.** *See supra* p. 230.

**10.** *See supra* p. 230.

**11.** Although DCA argues that this statement is hearsay and therefore inadmissable, we observe that the statement is not hearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence. That Rule provides that "[a] statement is not hearsay if ... [it] is offered against a party and is ... [made] by the party's agent or servant concerning a matter within the scope of the agency or employment, [and is] made during the existence of the relationship...." Fed.R.Evid. 801(d)(2)(D).

though DCA offers alternative meanings for the statements in question,[12] what inference to draw from a particular statement is a matter that must be decided at by the trier of fact at trial. *See, e.g., Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 467 (2d Cir. 1989); *Shamley v. International Tel. and Tel. Corp.,* 44 Fair Empl.Prac.Cas. (BNA) 1238, 1240, 1987 WL 9424 (S.D.N.Y.1987), *aff'd on other grounds,* 869 F.2d 167 (2d Cir.1989).

While these statements are "direct" evidence of DCA's intent to discriminate, the plaintiffs also present "indirect," or "circumstantial" evidence of discrimination at DCA. Because it is often difficult to obtain direct evidence of discriminatory intent, courts have permitted plaintiffs to introduce certain forms of indirect evidence in support of discrimination claims. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1185 (2d Cir.) *cert. denied* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992) (plaintiffs alleging employment discrimination can use both direct and indirect evidence to support their position).

■ One type of indirect evidence is proof that employees in similar situations were treated dissimilarly. *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990) (discriminatory intent can be established indirectly through evidence of the use of different disciplinary measures for employees who engaged in similar misconduct); *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.), *cert. denied* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) (same).[13] In this case, several of the plaintiffs cite DCA's retention of higher paid, less qualified Japanese employees, to whom, in large part, DCA assigned the plaintiffs' duties after the plaintiffs were fired. The evidence provided by Goyette, Benig, and Filicia indicating that each of the employees that assumed the plaintiffs' duties was less qualified than the plaintiffs suggests that DCA's explanation for the firing of the plaintiffs is a pretext for discrimination. Although specific Japanese employees did not assume the duties of Teller and Gerstein, the plaintiffs assert that Japanese employees in similar situations were treated more favorably. Accepting the plaintiffs' contention that DCA employees often perform activities that might fall into another department's area of responsibility, Teller and Gerstein were not only competing with colleagues in their specific department, but with employees in related departments as well. Consequently, the retention of Japanese employees in connected departments, with performance records inferior to those of Teller and Gerstein, suggests that DCA's explanation for the firing of Teller and Gerstein is a pretext. The plaintiffs also maintain that DCA provided higher compensation and a greater number of benefits to Japanese employees and that this fact is additional evidence of DCA's discrimination against American workers. The plaintiffs argue that Goyette, who had a higher title than Fujisaki (an expatriate), earned about * * * less than Fujisaki per year. *See* Raskin Aff., Ex. C at 979. The plaintiffs point to a similar discrepancy between the salary of Teller and the salaries of Yamada (an expatriate) and Hatachi (an expatriate), who held lower positions than Teller. Raskin Aff., Ex. D; Affidavit of Judith Teller, ¶ 14. Furthermore, the evidence that Japanese expatriates with titles below that of Senior Vice President received cars,[14] club memberships, and check cashing privileges indicate disparate treatment; no American employees received these benefits. In addition, the fact that Friday afternoon meetings are open only to Japanese employees (Japanese expatriates and Japanese–

---

**12.** For example, DCA argues that Naito's statement to Goyette referred only to the specific issue of whether or not American employees could be transferred to Dentsu in Japan or other Dentsu subsidiaries in the United States. *See* Reply Memorandum of Law in Further Support of Defendant DCA's Motion for Summary Judgment ("Defendant's Reply Memo.") at 29–32.

**13.** In its brief, defendant cites *Goluszek v. H.P. Smith,* 697 F.Supp. 1452 (N.D.Ill.1988), to support its argument that the plaintiff has not proved the essential elements of its case. *See* Defendant's Memo. at 38. However, the *Goluszek* Court granted summary judgment because the plaintiff had not shown that the defendant retained similarly situated less qualified employees, while the plaintiffs in our case have presented such evidence.

**14.** DCA's written policy concerning the use of company cars limited this benefit to Senior Vice Presidents and above. *See* Raskin Aff., Ex G; Naito Dep. at 244, Raskin Aff., Ex H.

Americans), is also evidence of disparate treatment based upon national origin. Finally, the refusal to send Benig with Masatsugu Fujishima ("Fujishima"), and Nakahara (both Japanese–Americans) to Tokyo for specialized training, demonstrates the favoritism DCA showed its Japanese employees.

In response to these allegations, DCA asserts that the plaintiffs have compared employees in different positions, and that when the proper comparisons are made, there is no difference between the salaries of the Japanese and American employees. DCA also maintains that only expatriates received the extra compensation and fringe benefits. Whether DCA's explanation is true, or whether the disparate treatment was based upon national origin, is a material issue of fact for the trier of fact to decide.

When viewed together, the remarks of the Japanese executives, the reassignment of duties, and the additional benefits provided to the Japanese expatriates and the Japanese–Americans all suffice to create a genuine factual issue as to whether DCA's stated reason for the firings—a reduction in force to cut losses—was pretextual. Accordingly, DCA's motion for summary judgment on the plaintiffs' disparate treatment claim is denied.

## C. Material Issues of Fact Exist Regarding DCA's "Mixed Motives"

■ In addition to arguing that DCA's explanation is a pretext, the plaintiffs have also argued that their terminations resulted from DCA's "mixed motives." A mixed motives case is one in which the employment decision at issue is based upon both legitimate and illegitimate motives. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 1785–86, 104 L.Ed.2d 268 (1989). For example, an employer may fire an employee because that employer wants to reduce the size of its workforce *and* because that employer intends to discriminate against a particular class of employees (*e.g.,* women, blacks, Americans). In such cases, the *McDonnell Douglas–Burdine* framework for disparate treatment cases does not apply.

*See Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788–89. Instead, in a mixed motives case, if the plaintiff proves by a preponderance of the evidence that an impermissible consideration played a motivating part in an employment decision, the burden of proof shifts to the defendant to show that it would have made the same decision, even in the absence of the unlawful motive. *See id.* at 252, 109 S.Ct. at 1791–92; *accord Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.), *cert. denied* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The plaintiffs in our case assert that the previously discussed facts[15] are evidence of DCA's illegitimate motives. We agree. Therefore, material issues of fact remain regarding DCA's motives for firing the plaintiffs. Accordingly, DCA's summary judgment motion regarding the plaintiffs' mixed motives claim must be denied.

## II. DCA'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM OF DISPARATE IMPACT IS GRANTED BECAUSE STATISTICAL EVIDENCE CANNOT DIFFERENTIATE BETWEEN LEGAL AND ILLEGAL DISCRIMINATION IN THIS CASE AND THE PLAINTIFFS HAVE NOT PRESENTED ANY OTHER EVIDENCE IN SUPPORT OF THEIR DISPARATE IMPACT CLAIM

■ A case of disparate or adverse impact discrimination is one in which a plaintiff proves that a policy of its employer, although neutral on its face, is discriminatory in its effects. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (employer's requirement of a high school diploma or the passing of general intelligence test as a condition of employment in four different departments (operations, maintenance, laboratory and test, and coal handling) at a power generating plant is prohibited because of its restrictive effects on black job applicants). Such a policy is only justified if it "serves, in a significant way, the legitimate employment goals of the employer." *Wards*

15. *See supra* pp. 233–34.

*Cove Packing Co. v. Atonio,* 490 U.S. 642, 659, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989). However, even if the policy significantly serves the legitimate employment goals of the employer, a plaintiff may still prevail in a disparate impact case by showing that an alternative non-discriminatory policy would serve the employer's legitimate interests with equal effectiveness. *See id.* at 660–61, 109 S.Ct. at 2126–27.

Statistical evidence of discriminatory effects is the most effective way for a plaintiff to prevail in a disparate impact case. *See Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 994–95, 108 S.Ct. 2777, 2788–89, 101 L.Ed.2d 827 (1988). However, statistical studies may not be used as evidence in all disparate impact cases. In a case where a defendant claims that it is discriminating based on citizenship, and the citizenship of the employees who the defendant is favoring is identical to the national origin of those employees,[16] statistical evidence is unhelpful. The same statistics which purportedly show that the defendant is discriminating based on national origin can be explained by the defendant's legal policy of favoring persons of a particular citizenship.[17]

■ For example, if a company favors Japanese citizens over non-Japanese citizens, statistical studies that indicate that the company is discriminating based on national origin can also be explained by the company's citizenship policies. Thus, statistical evidence cannot be used in disparate impact cases where the plaintiff claims that the defendant is discriminating based on national

origin, the defendant claims that it is discriminating based on citizenship, and the national origin and the citizenship of the parties favored is the same. *See MacNamara v. Korean Air Lines,* 863 F.2d 1135, 1148 (3d Cir.), *cert. denied* 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

■ In the instant case, the policy at issue is DCA and Dentsu's policy of repatriation of former Dentsu employees. This policy provides that former employees of Dentsu in Japan who perform inadequately at DCA cannot be fired. Instead, DCA either returns the expatriates to their former assignments with Dentsu in Japan or finds alternative employment for them with another Dentsu affiliate. No such efforts or arrangements are ever made for discharged American employees. Because of this disparity, the plaintiffs argue that this policy, while facially neutral vis-a-vis Title VII, has a discriminatory impact upon all American employees of DCA. However, the national origin and the citizenship of the parties favored by DCA's policy are identical (i.e. both are Japanese). For the reasons discussed above, the plaintiffs' and defendant's statistical analyses are not helpful in this case.[18]

■ In response to the plaintiffs' disparate impact claim, DCA argues that the Treaty of Friendship, Commerce, and Navigation between the United States and Japan ("FCN Treaty"),[19] permits DCA to discriminate based on national origin, despite the

---

**16.** "National origin," as previously defined, refers to where an individual, or his or her ancestors, is from. *See supra* p. 2. In contrast, citizenship, although not explicitly defined by the cases, is commonly understood to encompass an individual's legal membership in a particular country. Often, an individual's national origin and citizenship are the same. In a country as diverse as the United States, however, an individual's national origin and citizenship are frequently different.

**17.** It is well-settled that Title VII permits discrimination based upon citizenship. *See Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 95, 94 S.Ct. 334, 340, 38 L.Ed.2d 287 (1973) ("nothing in …

[Title VII] makes it illegal to discriminate on the basis of citizenship or alienage").

**18.** We also note that the plaintiffs have used statistics in support of their disparate treatment claim. We believe that, for the reasons discussed above, statistics will be, for the most part unhelpful in proving plaintiffs' disparate treatment claim. Plaintiffs can only use statistics to compare the treatment of the Japanese–Americans with the treatment of the plaintiffs.

**19.** Article VIII(1) of the FCN Treaty allows "companies of either Party [to the Treaty] … to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice." 4 U.S.T. 2063, 2070.

commands of Title VII.[20] We disagree. As stated by the Second Circuit in *Avigliano v. Sumitomo Shoji Am., Inc.,* 638 F.2d 552 (2d Cir.1981), *rev'd and remanded on other grounds,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982), Article VIII of the FCN Treaty does not exempt a Japanese company operating in the United States, whether a parent or a subsidiary organization, from the reach of Title VII. *See id.* at 559.[21]

A Japanese corporation doing business in the United States can only hire according to national origin if the company can show that national origin is a bona fide occupational qualification ("bfoq"). *See id.*[22] Although this exception is generally interpreted strictly, *see Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977), the Second Circuit has determined that "as applied to a Japanese company enjoying rights under Article VIII of the Treaty, [this exception to Title VII] must be construed in a manner that will give due weight to the Treaty rights ..." *Id.* In order to accommodate the employer's treaty rights, the court must consider whether or not a position requires the following four factors:

> (1) Japanese linguistic and cultural skills, (2) knowledge of Japanese products, markets, customs, and business practices, (3) familiarity with ... the parent enterprise in Japan, and (4) acceptability to those persons with whom the company ... does business.

*Id.* Under this test, the employer has the burden of proving that national origin is a bfoq. *See id.*

In the instant case, however, assuming that the treaty applies to DCA,[23] DCA has presented no evidence to prove that Japanese national origin is a bfoq for employment at DCA. Moreover, the Court observes that according to DCA's own job descriptions, none of the skills listed above are requirements for the positions from which the plaintiffs were fired.[24] Therefore, the FCN Treaty does not entitle DCA to implement an employment policy that discriminates based on national origin.

In sum, because the plaintiffs have not presented any evidence other than statistics to support their disparate impact claim, DCA's motion for summary judgment on the disparate impact claim is granted.

III. DCA'S MOTION FOR SUMMARY JUDGMENT ON THE PLAINTIFFS' CLAIMS UNDER THE NEW YORK STATE HUMAN RIGHTS LAW IS DENIED IN PART AND GRANTED IN PART BECAUSE THE GENERAL STANDARDS OF PROOF UNDER THE HUMAN RIGHTS LAW ARE THE SAME AS THOSE UNDER TITLE VII

A plaintiff in an employment discrimination case is required to prove the same elements for both New York State Human Rights Law and Title VII claims. *See Kremer v. Chemical Const. Corp.,* 456 U.S. 461,

**20.** We observe that DCA also asserts that the FCN Treaty allows it to discriminate based on citizenship. As noted above, however, both American companies and foreign companies operating in the United States enjoy the right to discriminate based on citizenship even in the absence of a treaty.

**21.** After reviewing the historical background of the FCN Treaty, the *Avigliano* Court found that the treaty's drafters intended the treaty to allow Japanese companies in the United States to avoid restrictions on the employment of non-American citizens. They did not intend to exempt Japanese companies from other American employment laws. *See Avigliano,* 638 F.2d at 559.

**22.** Section 703(e)(1) of Title VII, 42 U.S.C. § 2000e–2(e)(1), expressly provides that "it shall

not be an unlawful employment practice for an employer to hire and employ employees, ... on the basis of ... national origin in those certain instances where ... national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise...."

**23.** At this time it is not necessary for the Court to rule on whether or not DCA, as Dentsu's subsidiary, can assert Dentsu's rights under the treaty.

**24.** The various job qualifications, as set forth by DCA, include a certain number of years of experience in advertising, educational degrees, and various managerial, organizational, and creative skills, all of which differ with each position. *See* Affidavit of Howard Veisz, Ex. JJ and Ex. NN. No job that a plaintiff was fired from required any of the four skills enumerated in *Avigliano.*

**238**

479–80, 102 S.Ct. 1883, 1896–97, 72 L.Ed.2d 262 (1982); *Song v. Ives Lab. Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992). Therefore, just as material issues of fact remain with respect to the plaintiffs' Title VII claims of pretext and mixed motives, so too material issues remain with respect to the plaintiffs' Human Rights Law claims under these two theories. Accordingly, DCA's motion for summary judgment on the plaintiffs' claim of disparate treatment under the Human Rights Law is denied.

Similarly, the standards of proof for a disparate impact case under the Human Rights Law are comparable to those for a disparate impact case under Title VII. *See People v. New York City Transit Auth.*, 59 N.Y.2d 343, 465 N.Y.S.2d 502, 504, 452 N.E.2d 316, 318 (Ct.App.1983); *Sontag v. Bronstein*, 33 N.Y.2d 197, 351 N.Y.S.2d 389, 392–93, 306 N.E.2d 405, 407 (Ct.App.1973). Therefore, the logic that precludes the plaintiffs from asserting a disparate impact claim under Title VII is applicable to their New York State Human Rights claim as well.[25] Accordingly, DCA's summary judgment motion on the plaintiffs' disparate impact claim under the New York State Human Rights Law is granted.

### Conclusion

DCA's motion for summary judgment is denied in part and granted in part. With respect to the plaintiffs' Title VII claims of disparate treatment, DCA's motion for summary judgment is denied. With respect to the plaintiffs' Title VII claim of disparate impact, DCA's motion for summary judgment is granted. DCA's motion for summary judgment on the plaintiffs' state law claims is denied with respect to disparate treatment and granted with respect to disparate impact.

SO ORDERED.

---

**25.** As under Title VII, discrimination based on citizenship is permitted under the New York State Human Rights Law. *See* 3 CCH Employment Prac. Guide ¶ 26,051 p. 8899.