Emanoil D. (Dan) VASILESCU, Plaintiff,

v.

**BLACK & VEATCH PRITCHARD, INC., Defendant.**

Civil Action No. 00–2268–GTV.

United States District Court, D. Kansas.

Aug. 6, 2001.

Bert S. Braud, The Popham Law Firm, P.C., Kansas City, MO, for plaintiff.

W. Perry Brandt, Timothy S. Millman, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Shaw, LLP, Kansas City, MO, for defendants.

## MEMORANDUM AND ORDER

VanBEBBER, Senior District Judge.

This action is before the court on defendant Black & Veatch Pritchard, Inc.'s summary judgment motion (Doc. 41). Defendant is the former employer of plaintiff Emanoil D. (Dan) Vasilescu. Defendant terminated plaintiff's employment in 1999, and plaintiff brought the instant action.

Plaintiff alleges that his termination was unlawful for several reasons. He alleges that it was discriminatory based on his age—fifty-two—in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., and that it was discriminatory based on his national origin—Romanian—in violation of 42 U.S.C. § 1981 and § 2000(e) et seq. of Title VII of the Civil Rights Act of 1964. Plaintiff further alleges that his termination was in retaliation for his complaining of age and national origin discrimination, which violated the ADEA, Title VII, and § 1981. Plaintiff also alleges several claims under Kansas state law—a breach of implied contract claim, a promissory estoppel claim, and a negligent or fraudulent misrepresentation claim. All three state claims are based on plaintiff's belief that defendant was obligated to employ plaintiff until plaintiff obtained permanent residency in the United States. Defendant responds that plaintiff's employment was legitimately terminated pursuant to a reduction in force (RIF), and that defendant neither made any promises to employ plaintiff for a specified amount of time, nor broke any promises regarding plaintiff's employment.

This court has subject matter jurisdiction over the case pursuant to 28 U.S.C. §§ 1331 and 1367(a). Venue is proper in this court, and the parties do not dispute personal jurisdiction. For the reasons stated below, the court grants defendant's summary judgment motion as to plaintiff's federal claims, and declines to exercise supplemental jurisdiction over plaintiff's state claims.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial. See *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. See *id.* The court must consider the record in the light most favorable to the nonmoving party. See *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984).

## II. FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most

favorable to plaintiff's case. Immaterial facts and facts not properly supported by the record are omitted.

Plaintiff, a native of Romania, was born on December 17, 1946. He and his wife, also Romanian, moved to Canada, and became dual citizens of Romania and Canada. While living in Canada, they attended a job fair, where they talked with a representative from defendant about moving to the United States to work for defendant. As a term of employment, plaintiff requested that he receive assistance in obtaining permanent resident status in the United States, and requested assurances that he was not coming to work for a short time period. In his deposition, plaintiff testified about his understanding of the employment agreement: "I didn't expect [defendant] to hire me and keep me until I retire, but at least to keep me until they— until I get the permanent resident status in the United States."

Both plaintiff and his wife left their home in Canada and began working for defendant on January 19, 1998. Plaintiff worked in defendant's Piping Department as a Technical Designer 3, Job Family/Level 0307. He was responsible for designing and drafting piping layouts in connection with petroleum refineries and plants and was a first level supervisor. Plaintiff's wife also worked in the Piping Department, but as a Technical Designer 2, Job Family/Level 0306. She did not have any supervisory responsibilities.

Plaintiff received a performance rating for 1998 of L–2, which is the second lowest out of nine possible ratings. "L-row ratings," consisting of L–1, L–2, and L–3, are the lowest employee performance ratings given by defendant. Plaintiff's performance assessment, compiled by his Development Leader, Arthur Craig Elwell, with the input of four evaluators suggested by plaintiff, identified several problem areas with respect to plaintiff, including commu-

nication skills, management skills, budgeting, and timeliness. Plaintiff was issued a Developmental Performance Improvement Plan and was placed on probation on April 12, 1999. After being temporarily transferred to the Civil Department and receiving negative performance feedback there, plaintiff received a Final Written Warning on June 25, 1999. On September 13, 1999, allegedly in conjunction with a reduction in force (RIF), defendant terminated plaintiff's employment. Six employees were terminated in plaintiff's department, all of whom had ratings in the L-row. Of the remaining employees in the department, none had a performance rating as low as plaintiff's. Plaintiff's wife continued working for defendant after plaintiff's termination.

The above-mentioned facts are not comprehensive. Additional facts will appear in this opinion as necessary.

## III. DISCUSSION

### A. Age and national origin discrimination claims under the ADEA and Title VII

Plaintiff alleges that he was terminated because of his age and national origin, in violation of the ADEA and Title VII. Because plaintiff has presented no direct evidence of discrimination, the court turns to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1137 (10th Cir.2000) (applying *McDonnell Douglas* analysis to age discrimination claim); *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir.2000) (applying *McDonnell Douglas* analysis to national origin discrimination claim). Under the *McDonnell Douglas* framework, plaintiff first must establish a prima facie case of discrimination. See *McDonnell Douglas*, 411 U.S. at 802, 93

S.Ct. 1817. In the context of a RIF, a plaintiff proves his prima facie case by showing that he was within the protected age group, his work was satisfactory, he was discharged despite his satisfactory work, and there is some evidence that, in reaching its RIF decision, the defendant intended to discriminate against him. See *Stone*, 210 F.3d at 1137 (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 621 (10th Cir. 1994)). The plaintiff may establish intention to discriminate " 'through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the [RIF].' " *Id.* (quoting *Ingels*, 42 F.3d at 621) (additional citation omitted).

Once plaintiff establishes a prima facie case, the burden shifts to defendant. Defendant must offer a legitimate, non-discriminatory reason for the adverse action. See *id.* Finally, if defendant offers a legitimate reason, the burden returns to plaintiff. Plaintiff must establish "a genuine dispute of material fact as to whether [defendant's] proffered reason for the challenged action is pretextual—i.e. unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). In the context of a RIF, there are three common ways a plaintiff establishes pretext: He may present evidence that his termination is inconsistent with the defendant's RIF criteria, that a performance evaluation was falsified to justify termination, or that the RIF was " 'more generally pretextual.' " See *Stone*, 210 F.3d at 1140 (quoting *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir.1998)).

### 1. Prima facie case

█ In the instant case, the parties only quarrel over whether plaintiff has offered some evidence that defendant intended to discriminate against him. Defendant argues that plaintiff must identify a younger and/or non-Romanian L-row rated Technical Designer 3, Job Family/Level 0307 in the Piping Department who was retained in order to show discriminatory intent. Plaintiff argues that "[d]efendant's engineers were almost fungible," and that plaintiff need not identify younger employees in plaintiff's exact position. The court agrees with plaintiff.

The Tenth Circuit has explained how a plaintiff may show discriminatory intent: "Evidence that an employer fired qualified older employees but retained younger ones in similar positions is sufficient to create a rebuttable presumption of discriminatory intent...." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir.1988). Even though the employer may explain its decision by the exigencies of a RIF, "these exigencies are best analyzed at the stage where the employer puts on evidence of a nondiscriminatory reason for the discharge." *Id.* "[T]he burden imposed on a plaintiff at the prima facie stage is 'not onerous.' " *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1197 (10th Cir.2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The Tenth Circuit's recent decision in *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir.2000) emphasizes the minimal burden placed on a plaintiff at the prima facie case stage. In *Kendrick*, a non-RIF discriminatory discharge case, the court held that "a plaintiff alleging discriminatory discharge ordinarily need not show that a person outside of the protected class was hired to fill his former position in order to make out a prima facie case of discrimination." *Kendrick*, 220 F.3d at 1229. Although the Tenth Circuit has not addressed the impact of Kendrick on a RIF case, the reasoning in Kendrick indicates that a plaintiff need not compare himself to others with identical jobs and performance ratings.

In *Beaird v. Seagate Technology, Inc.*, the Tenth Circuit held that where at least

one younger and/or nonminority employee was retained in the same job code, the plaintiffs met their burden of proof. See *Beaird*, 145 F.3d at 1168. Although performance was one of the RIF criteria, the court in Beaird did not compare the performance history of the younger employees to that of the older, terminated employees at this stage of the analysis. See generally *id.* Instead, the court merely compared employees in similar positions.

The record reveals that numerous younger and non-Romanian employees in plaintiff's position or similar positions were retained during the RIF. One younger American, L-row rated Technical Designer 3, Job Family/Level 0307 was transferred from the Piping Department before the RIF, and this had the effect of saving her job. The court concludes that this evidence is sufficient to establish discriminatory intent and that plaintiff has established a prima facie case.

2. Legitimate, non-discriminatory reason

■ Defendant has presented a legitimate, non-discriminatory reason for plaintiff's termination, i.e., that plaintiff was laid off as part of a RIF due to lack of work, and states that performance was the key factor in determining which employees from the Piping Department would be terminated. Defendant points out that all of the employees in the Piping Department rated in the L-row for 1998 were selected for termination. This explanation satisfies defendant's burden.

### 3. Pretext

The burden shifts to plaintiff to establish that defendant's explanation is pretextual. Plaintiff focuses his energy on showing that his low performance rating, allegedly responsible for his termination, is pretextual. He also cites remarks made about his age and national origin as evidence that his termination was "more generally pretextual."

■ In an attempt to suggest that his low performance rating was pretextual, plaintiff argues that there were several "inconsistencies," such as allegedly missing documents and testimony by one of his supervisors that plaintiff's mistakes were not severe enough to be "written up." The court has reviewed all of these so-called "inconsistencies," and concludes that they are not as suggestive as plaintiff advances. Even considered collectively, they are insufficient to convince a reasonable jury that plaintiff's poor performance rating, a precursor to his termination, was pretextual.

■■ In a further attempt to show pretext, plaintiff submits that he was removed from a squad leader position and replaced by Guy Norris, who was four years younger than plaintiff, and that all but one of the six employees terminated in plaintiff's department pursuant to the RIF were over forty years old. The court concludes that these facts are insufficient to show pretext. Mr. Norris was not significantly younger than plaintiff. Evidence that an insignificantly younger employee replaced a plaintiff is insufficient to establish an inference of age discrimination. See *Sims v. Halliburton*, No. 98–6300, 1999 WL 495629, at *12 (10th Cir. July 14, 1999). Furthermore, plaintiff has offered the statistic that five out of six terminated employees were over age forty in isolation. Statistics alone may be insufficient to support a finding of pretext. Plaintiff's assertion is much like the plaintiff's assertion in *Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 979 (10th Cir.1996): "[The plaintiff] suggests that age discrimination can be inferred because a greater percentage of older workers were selected for the RIF while a greater percentage of younger people were hired afterwards." In *Doan*, the Tenth Circuit held this statistical assertion

inadequate to establish pretext. The court stated:

"Statistics taken in isolation are generally not probative of age discrimination." In this case, [the plaintiff's] statistical evidence is flawed because it failed to compare similarly situated individuals and failed to eliminate nondiscriminatory reasons for the numerical disparities.... "A plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals." Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext.

*Id.* (citations and additional internal quotation marks omitted). Here, plaintiff's numbers do not take into account any non-discriminatory explanations, such as, hypothetically, the possibility that most employees in the Piping Department were over age forty. The court therefore concludes that this evidence is insufficient to create a genuine issue of pretext for a jury.

In a final attempt to show pretext, plaintiff cites comments made about his age. In his deposition, plaintiff recounted how at a meeting during his first week working for defendant, several employees discussed how plaintiff looked good for his age, and that they did not realize he was so old. Plaintiff also testified in his deposition that many times, Eric Poole, a co-worker, asked him, "How are you, old fart?"

Plaintiff also cites several comments which he claims evidence national origin discrimination. He testified in his deposition that other employees made "consistently permanent references to [his] origin and to [his] accent, foreigner accent, complaining that they cannot understand [his] accent" and asked him, "Where are you from?" Mr. Elwell testified in his deposition that he had heard comments about the expensive car plaintiff drove and comments that Asian employees were cheaper to employ than other nationalities, but he could not recall who made the comments. Plaintiff also found a cartoon hanging on a bulletin board in defendant's workplace that referred to "God Dam [sic] Canadians and there [sic] fancy foreign cars." However, plaintiff did not know who the artist was, who had posted it, or who had seen it.

Larry Ripple, Manager of the Piping Department, testified in his deposition that he heard Bob Hutchin, plaintiff's direct supervisor, continually ask plaintiff, "Do you understand?" Plaintiff testified in his deposition that Mr. Hutchin told plaintiff that "this is the way we do, you are a foreigner, this is the way you have to do the work over here" and that Mr. Hutchin referred to plaintiff as a "foreigner." Plaintiff also testified in his deposition that Mr. Ripple told plaintiff that he could hire other people who could "do the same job ... for less money," and that "Canadians are too expensive for the jobs."

■ The court notes that several of the allegedly discriminatory comments plaintiff cites are irrelevant. Plaintiff cites comments by non-decision makers and comments about Canadians. "[A]ge-related [or national origin-related] comments by non-decisionmakers are not material in showing the [employer's] action was based on ... discrimination." *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994). Furthermore, plaintiff's national origin is Romanian, not Canadian. The Supreme Court held long ago that "national origin" under Title VII refers to a person's country of birth or his ancestors' country of birth. See *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). The Court declined to extend the definition to include countries where one is a citizen. See *id.* at 90–91, 94 S.Ct. 334. "Nothing in [Title VII] makes

it illegal to discriminate on the basis of citizenship...." *Id.* at 95, 94 S.Ct. 334. Accordingly, the court has not considered comments made by non-decision makers or comments relating to plaintiff's Canadian citizenship.

■ As for the remaining comments, the court concludes that they are nothing more than "stray remarks." See *Stone*, 210 F.3d at 1140. While age or national origin-related comments made by a decision maker may support an inference of discrimination, "isolated [or] ambiguous comments" may not support such an inference. See *id.* (citation omitted). "Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." *Cone*, 14 F.3d at 531 (citation omitted).

■ Here, the remaining comments made by Mr. Hutchin are both isolated and ambiguous. The record does not reveal when they were made or in what context. There is no evidence that they were in any way associated with plaintiff's termination. "A plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement and the [defendant's] termination decision, and therefore 'that age [or national origin] actually played a role in the defendant's decision-making process and had a determinative influence on the outcome.'" *Stone*, 210 F.3d at 1140 (quoting *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994)) (other citations omitted). Plaintiff has failed to show that Mr. Hutchin was involved in his termination. The evidence shows that Mr. Ripple made the decision to terminate plaintiff. Mr. Hutchin's role was only as one of the persons who provided input which resulted in plaintiff's poor performance rating. The court concludes that his isolated and ambiguous comments are "stray remarks."

■ Finally, the court observes a few facts which make plaintiff's arguments of pretext even less convincing. Mr. Ripple, Mr. Hutchin, and Mr. Elwell were all over forty in 1998. Mr. Ripple selected plaintiff for termination, and Mr. Hutchin and Mr. Elwell were partly responsible for plaintiff's low performance rating which led to the termination. While the fact that decision makers are in the same class as a plaintiff is not dispositive, "[a] plaintiff may have difficulty establishing discrimination where the alleged discriminatory decision-maker is in the same protected class...." *Kendrick v. Penske Transp. Servs., Inc.*, No. 98–2289–KHV, 1999 WL 450886 (D.Kan. Apr.13, 1999), aff'd, 220 F.3d 1220 (10th Cir.2000). Furthermore, the court notes that plaintiff's wife, who also was Romanian, was not terminated in 1998 as part of the RIF. The other five employees were American. Plaintiff's national origin discrimination claim would be more plausible if others from his native country also had been terminated. In sum, the court concludes that no reasonable jury could find that defendant's proffered legitimate reason for plaintiff's termination was pretextual.

**B. Retaliatory discharge claims under the ADEA and Title VII**

■ Plaintiff alleges that he was terminated in retaliation for his complaints of age and national origin discrimination, in violation of the ADEA and Title VII. Again, to evaluate a claim of retaliation, the court applies the burden-shifting analysis of *McDonnell Douglas*. To establish a prima facie case of retaliation, a plaintiff must show that he "engaged in protected opposition to discrimination," that he was subjected to an adverse employment action after the protected opposition, and that there is a causal connection between the two. See *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000) (citing *McGarry v. Bd. of County Comm'rs*, 175 F.3d 1193, 1201 (10th Cir.1999)). Here,

plaintiff fails to prove either that he engaged in protected opposition or, assuming that he did engage in protected opposition, that there was any causal connection between the opposition and his termination.

As evidence of protected opposition, plaintiff offers letters written by plaintiff and his attorney, Robert Van Cleave. Beginning February 18, 1999, Mr. Van Cleave wrote several letters to defendant regarding plaintiff's attempt to obtain permanent resident status.[1] On February 24, 1999, plaintiff wrote a letter to Mr. Ripple advising him that plaintiff had obtained an attorney "in order to eliminate and avoid any misunderstanding which may occur in our process of obtaining our permanent resident status." Mr. Van Cleave wrote Mr. Ripple a letter dated April 29, 1999, objecting to plaintiff's placement on probation and the Developmental Performance Improvement Plan. After stating that he "represent[ed] [plaintiff] concerning his employment problems with [defendant], most recently working to the resolution of his immigration status," Mr. Van Cleave stated that "[t]he [Developmental Performance Improvement Plan] is truly an intimidation to my client and is a product of retaliation for the unfortunate employment situation he was in, which was contributed to substantially by the failure of the company to come through on its promises." Mr. Van Cleave used the term retaliation again in a letter dated June 25, 1999, after plaintiff received his Final Written Warning. After making several references to plaintiff's immigration status and a forced hiatus from work while the immigration paperwork was processed, Mr. Van Cleave stated, "This is truly retaliation in its rankest sense."

Finally, plaintiff wrote a letter to Mr. Ripple dated June 26, 1999, which was forwarded to the Human Resources Department. The letter stated, in relevant part:

> Mr. Hutchin made a suggestion that one of my goals should be to improve my communication skills.... I concluded that there are a numbers [sic] of people, who cannot accept my foreign accent and they are confusing the accent with communication skills.

> . . . . .

> It was very strange that the first opinion [of plaintiff's poor performance] surfaced after we had the first disagreement concerning the resident status in the United States.... I do not understand also why Mr. Larry Ripple made my evaluation in a discriminatory manner and not by the rules set by the company regarding this process.

> From this very moment I assume that the Head of the Piping Department embarked himself in a lethal process of harassment, setting as a goal the termination of my employment.

> . . . . .

> I also want to mention the fact that after I asked Mr. Ripple about my status in the process of obtaining my permanent residence, the department assigned Mr. Guy Norris to work in the same position as me and soon replaced me.... Mr. Ripple replaced me because I was the only one vulnerable foreigner who had Mr. Guy Norris's expertise. Mr. Ripple told me that he has obligations to "his own people."

> . . . . .

> As per the last paragraph of the final warning, I understand that my daily monitoring is not designed to support

---

1. Plaintiff alleges that the first letter was dated January 22, 1999, but the court was unable to locate such a letter in the record.

my good performance, but it is just another form of harassment.

. . . . .

I am quite surprised by the discriminatory conditions of my employment.

. . . . .

I was treated as a foreigner; I was pushed to the limit. I consider that all this effort is used because somebody feels guilty of the negligence in dealing with my situation.

Jerry Caraher, Manager of the Human Resources Department, saw the letter, but did not interpret it as a complaint of discriminatory conditions. Plaintiff testified in his deposition that he never made a written complaint of national origin discrimination, and that he never made any complaints of age discrimination.

Plaintiff alleges that Mr. Van Cleave's letters and his own letter dated June 26, 1999 constitute protected opposition to discrimination. He directs the court to Mr. Van Cleave's use of the word "retaliation," his own use of the words "discriminatory" and "harassment," and his own allegation that he was "treated like a foreigner."

Judge Vratil of this District has addressed the scope of protected activity under the ADEA, which would apply to both of Plaintiff's claims:

> While some courts have indicated that vague references to unspecified discrimination are not protected, no clear rule has emerged as to the level of specificity required, and the standard employed by most courts is not exacting.
> Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as

a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination. But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate. The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.

*Garcia–Paz v. Swift Textiles, Inc.*, 873 F.Supp. 547, 560 (D.Kan.1995) (internal citations omitted). More recently, the Tenth Circuit considered a case in which an employee made a comment to management that she "hoped this was not an example of disparate treatment." *Lundien v. United Airlines*, No. 00–1083, 2000 WL 1786579, at *9 (10th Cir. Dec.6, 2000). The Tenth Circuit concluded that "[h]er statement was simply a conclusory remark, without sufficient detail for [the defendant] to know what to investigate." *Id.* Accord, *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313–14 (6th Cir.1989) (affirming the district court's determination that an allegation of "ethnocism" was too vague to constitute protected opposition under the Elliott–Larsen Act[2]); *Blount v. Glickman*, No. 96 C 6295, 1998 WL 325235, at *6 (N.D.Ill. June 10, 1998) (holding that a plaintiff's letter requesting leave for four reasons, including "discrimination," did not put her employer on notice that she was complaining of dis-

---

**2.** The Elliott Larsen Act is Michigan state law which prohibits retaliatory conduct. See Mich. Comp. Laws Ann. § 37.2701. Courts use the *McDonnell Douglas* test when applying the Michigan law, and consult Title VII decisions when resolving questions under the state statute. See *Becker v. Fed. Express Corp.*, No. 96–1196, 1997 WL 80937, at *2 (6th Cir.1997).

crimination in violation of Title VII or the ADA).

Plaintiff's general complaints of discrimination are no more detailed than the plaintiff's comment in *Lundien v. United Airlines.* Neither Mr. Van Cleave nor plaintiff makes any reference to the *type* of discrimination or retaliation that he purports to be alleging. Nowhere is the term "age" or "national origin" or "Romanian." Moreover, the court notes that plaintiff testified in deposition that he made no written complaint of age or national origin discrimination. Finally, each time Mr. Van Cleave or plaintiff complained about retaliation or discrimination, it was in the context of plaintiff's quest for permanent residency. The slow processing of plaintiff's immigration paperwork appears to be Mr. Van Cleave and plaintiff's primary focus. The court concludes that no reasonable jury could find that plaintiff's complaints "sufficiently convey[ed] [plaintiff's] reasonable concerns that the employer has acted or is acting an unlawful discriminatory manner." *Garcia–Paz*, 873 F.Supp. at 561. Consequently, plaintiff has not shown that he engaged in "protected opposition to discrimination," and therefore is unable to establish a prima facie case.

 Even if plaintiff were able to show that he engaged in protected opposition, he is unable to prove causation. Plaintiff has offered no direct proof of causation. "In the absence of any direct proof of a causal connection, the plaintiff can create an inference of a causal connection from the temporal proximity of the events. An inference based on timing can only be made, however, where close temporal proximity exists between the bringing of the charges and the subsequent adverse action." *Watson v. Lucent Techs., Inc.*, 92 F.Supp.2d 1129, 1136 (D.Kan.2000). The Tenth Circuit has held that a one and one-half-month period between charges of discrimination and an adverse action is short

enough to establish causation. See *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (citing *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir.1994)). It has also held that a three-month period is insufficient to establish causation. See id. (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir.1997)). By contrast, the Tenth Circuit has declined to decide whether two months and three weeks or two months and six days is sufficient to establish causation. See, e.g., *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Freeman v. Santa Fe Ry.*, No. 99–3200, 2000 WL 1227863, at *3 n. 3 (10th Cir. Aug.30, 2000). Judge Vratil, however, has held that a period of over two months, combined with the fact that there was no evidence that the decision maker had any knowledge of the plaintiff's complaints and the fact that the plaintiff's complaints were not formal complaints to the Equal Employment Opportunity Commission (EEOC), was insufficient to establish causation. See *Kendrick*, 1999 WL 450886.

Here, Mr. Van Cleave wrote his letters between February of 1999 and April 29, 1999. Plaintiff wrote his most recent and detailed letter on June 26, 1999. He was not terminated until September 13, 1999—about two and one-half months after his most recent complaint. The L-row rating that made plaintiff a prime candidate for termination during the RIF was recommended and approved long before plaintiff made any complaints. Furthermore, as noted above, plaintiff testified that he never made complaints about age or national origin discrimination. As in *Kendrick v. Penske Transportation Services, Inc.*, any complaints plaintiff made while employed by defendant were not made to the EEOC. Finally, the court notes that when Mr. Caraher received plaintiff's June 26, 1999 letter, he did not interpret the letter as a complaint of illegal discrimination. Based

on these undisputed facts, the court concludes that no reasonable jury could find that plaintiff has established causation.

### C. National origin discrimination and retaliation claims under 42 U.S.C. § 1981

▉ Plaintiff claims that defendant's alleged national origin discrimination and retaliation is prohibited by 42 U.S.C. § 1981. The court disagrees. Section 1981 prohibits discrimination based on race, ancestry, or ethnic characteristics. See *Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n. 7 (10th Cir. 1991); *Shinwari v. Raytheon Aircraft Co.*, 25 F.Supp.2d 1206, 1209–10 (D.Kan.1998), aff'd. on other grounds, No. 98–3324, 2000 WL 731782 (10th Cir. June 8, 2000). However, "often the line between national origin discrimination claims under Title VII and racial discrimination claims under § 1981 is 'not a bright one.'" *Daemi*, 931 F.2d at 1387 n. 7 (quoting *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 614, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)). In *Shinwari v. Raytheon Aircraft Co.*, Judge Vratil considered a case similar to the case at hand. In *Shinwari*, the plaintiff's country of origin was Pakistan. See *Shinwari*, 25 F.Supp.2d at 1209. The plaintiff sought relief based on his national origin, but said nothing in the pretrial order about his race, ancestry, or ethnic characteristics. See *id.* at 1210. Judge Vratil granted summary judgment as to the plaintiff's § 1981 retaliation claim because he sought relief solely on the basis of his national origin. See *id.* at 1210. Before the court now are the same circumstances. Plaintiff

seeks relief based solely on his national origin—not on his race, ancestry, or ethnic characteristics. Section 1981 is not an avenue of relief for discrimination or retaliation based solely on national origin.[3]

### D. State law claims

Having granting summary judgment as to all of Plaintiff's claims over which the court has original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3) (1994); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

IT IS, THEREFORE, BY THE COURT ORDERED that defendant's motion for summary judgment is granted as to plaintiff's federal claims. The court declines to exercise supplemental jurisdiction over plaintiff's state claims and dismisses the state claims without prejudice.

The case is closed.

Copies of this order shall be transmitted to counsel of record.

**IT IS SO ORDERED.**

▉

---

**3.** Plaintiff cites *Ramirez v. Dep't of Corr.*, 222 F.3d 1238 (10th Cir.2000) as support for allowing his § 1981 claims. Ramirez is distinguishable from the instant case. In *Ramirez*, the Tenth Circuit held, with little discussion, that plaintiffs of Mexican–American descent had a § 1981 claim for national origin discrimination which survived a motion to dismiss. See *id.* at 1244. The plaintiffs had also alleged racial discrimination, claiming that Hispanics of Mexican–American descent were routinely denied supervisory positions by the defendant. See *id.* at 1241. Unlike the plaintiffs in *Ramirez*, the plaintiff in the instant case has failed to allege any discrimination based on his race.